126 T.C. No. 17


UNITED STATES TAX COURT


DOW A. AND SANDRA E. HUFFMAN, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 2845-04, 2846-04,      Filed May 16, 2006.
            2847-04, 2848-04.

     The sole issue for decision is whether a
correction to the inventory method employed by S
corporations owned by certain of the petitioners
constitutes an accounting method change that requires
an adjustment pursuant to sec. 481, I.R.C.  For periods
ranging from 10 to 20 years, the corporations'
accountant, in applying the link-chain, dollar-value
method of valuing LIFO inventory, omitted a step
required by that method.

     <u>Held</u>:  R's revaluations of the corporations'
inventories, to correct for the accountant's omissions,
constituted changes in a method of accounting employed by
the corporations, requiring adjustments pursuant to sec.
481, I.R.C., to prevent amounts of income from being omitted
solely on account of the changes.

---

[1]  Cases of the following petitioners are consolidated
herewith:  James A. and Dorothy A. Patterson, docket No. 2846-04;
Douglas M. and Kimberlee H. Wolford, docket No. 2847-04; and Neil
A. and Ethel M. Huffman, docket No. 2848-04.

Charles Fassler, Mark F. Sommer, Jennifer S. Smart, and
Brett S. Gumlaw, for petitioners.

Mark D. Eblen, for respondent.


OPINION


HALPERN, Judge:  These cases have been consolidated for
purposes of trial, briefing, and opinion.  By notices of
deficiency dated December 19, 2003 (the notices), respondent
determined deficiencies in Federal income taxes as follows:

| | Taxable (Calendar) Year Deficiency | | |
| Petitioners (Husband and Wife) | 1997 | 1998 | 1999 |
| --- | --- | --- | --- |
| Dow A. and Sandra E. Huffman | -- | $36,757 | $9,413 |
| James A. and Dorothy A. Patterson | -- | 35,542 | -- |
| Douglas M. and Kimberlee H. Wolford | -- | 33,422 | 1,966 |
| Neil A. and Ethel M. Huffman | $131,408 | 535,065 | 304,033 |

Petitioners have conceded some of the adjustments made by
respondent that give rise to the deficiencies in question, and
other adjustments are merely computational and do not require our
attention.  The sole issue for decision is whether a correction
to the inventory method employed by corporations owned by certain
of the petitioners constitutes an accounting method change that
requires an adjustment pursuant to section 481 of the Internal
Revenue Code of 1986, as amended and in effect for the years in

issue.[2]

Some facts have been stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference. We need find few facts in addition to those stipulated and shall not, therefore, separately set forth our findings of fact. We shall make additional findings of fact as we proceed.

## Background

All petitioners except for James A. and Dorothy A. Patterson resided in Kentucky at the time they filed their respective petitions. The Pattersons resided in Florida at the time they filed their petition.

### The Huffman Group

The Huffman group of corporations (Huffman group) consists of four members (sometimes, the members): Neil Huffman Nissan, Inc. (Nissan); Neil Huffman Volkswagen, Inc. (Volkswagen); Neil Huffman Enterprises, Inc., d.b.a. Neil Huffman Dodge (Dodge); and Neil Huffman, Inc., d.b.a. Huffman Chrysler Plymouth (Chrysler). The members sell new and used automobiles in Kentucky. At least one of each married pair of petitioners owns stock in one or more of the members. Each of the members has elected to be treated as an S corporation under the provisions of section 1361.

---

[2] Hereafter, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the years in issue.

Use of Inventories

The members of the Huffman group all sell merchandise (new and used automobiles).  Each, therefore, computes its gross income from sales during a year by subtracting from sales revenue the cost of the goods sold.  See sec. 1.61-3(a), Income Tax Regs. Because each is a merchant, each must also use inventories and an accrual method of accounting to determine the cost of the goods sold and to match that cost against sales revenue.  See secs. 1.471-1 (merchants must use inventories) and 1.446-1(c)(2)(i) (generally, where inventories necessary, accrual method must be used with regard to purchases and sales), Income Tax Regs.  As explained by Stephen F. Gertzman (Gertzman) in his treatise, Federal Tax Accounting, par. 6.02[2], at 6-5 & 6-6, (2d ed. 1993) (cited hereafter as Gertzman par. __, at __), in the case of a merchant that sells a large number of essentially similar or fungible items, the cost of the goods sold during any period is computed in steps, using inventories and an accrual method of accounting, along with various assumptions as to the manner in which the actual costs incurred in acquiring or producing items of inventory are allocated among the items so acquired or produced.  To compute the cost of goods sold during a year, the steps are as follows:  First, the costs of the items acquired or produced during the year are aggregated.  That total is then combined with the aggregate cost of the items on hand at the

beginning of the year to produce the total cost of the goods available for sale during the year. That last total is then allocated among items on hand at the end of the year (cost of ending inventory) and items sold during the year (cost of goods sold). The formula for determining cost of goods sold is essentially as follows:

          Cost of beginning inventory
        + Purchases and other acquisition or production costs
        = Cost of the goods available for sale
        - Cost of ending inventory
        = Cost of goods sold

Various cost-flow assumptions are used to allocate the cost of goods available for sale between goods sold during the year and goods remaining on hand at the end of year. Two assumptions generally used for financial accounting and tax purposes are first-in, first-out (FIFO) and last-in, first-out (LIFO).[3] Id. par. 6.08[2], at 6-84. Under FIFO, it is assumed that the first goods acquired or produced are the first goods sold and that the goods remaining in ending inventory are the last goods acquired or produced. Id. Under LIFO, it is assumed that the last goods acquired or produced are the first goods sold.[4] Id. We are

---

[3] FIFO is authorized by sec. 1.471-2(d), Income Tax Regs., and LIFO is authorized by sec. 472.

[4] The following example is based on an example in Gertzman, Federal Tax Accounting, par. 7.02, at 7-4 (2d. ed. 1993) (cited hereafter as Gertzman par. __, at __):

Example: Assume that, in its first year of operation, a
                                                    (continued...)

concerned here with certain aspects of LIFO.

The LIFO Method

    -- Introduction

We have said "the overriding purpose of * * * LIFO * * * is to match current costs against current income." UFE, Inc. v. Commissioner, 92 T.C. 1314, 1322 (1989). Gertzman describes the objective of the LIFO method similarly: "The objective of the LIFO method is to match relatively current costs against current

---

[4](...continued)
retailer acquires identical products at the following times and costs:

| Date | Number | Unit Cost | Total |
|------|--------|-----------|-------|
| Jan. 1 | 10 | $1.00 | $10.00 |
| Apr. 1 | 15 | 1.02 | 15.30 |
| July 1 | 15 | 1.04 | 15.60 |
| Oct. 1 | 10 | 1.06 | 10.60 |
| | 50 | | 51.50 |

Assuming that 12 units remain on hand at the end of the year, it is necessary to determine what portion of the $51.50 aggregate cost of goods available for sale should be allocated to those 12 units. The balance will be allocated to the 38 units sold and will be deemed the cost of goods sold.

Under FIFO, the ending inventory would be deemed to cost $12.68 (consisting of a layer of 10 units at $1.06 a unit and a layer of 2 units at $1.04 a unit). The balance of the cost of goods available for sale, $38.82, would be allocated to the 38 units sold and would be deemed the cost of goods sold.

Under LIFO, the ending inventory would be deemed to cost $12.04 (consisting of a layer of 10 units at $1.00 a unit and a layer of 2 units at $1.02 a unit). The balance of the cost of goods available for sale, $39.46, would be allocated to the 38 units sold and would be deemed the cost of goods sold.

revenues to compute a meaningful gross profit."  Gertzman par. 7.02[1], at 7-4. Gertzman posits that businesses have a continuing need for a certain level of inventory, and he justifies LIFO on the ground that the changing costs associated with maintaining that level of inventory should be expensed in the year incurred.  Id.  Gertzman believes that the LIFO objective of matching is achieved because the costs associated with changing prices are generally reflected in the cost of goods sold.  Id. at 7-5.  To the extent so reflected, those costs (when increasing) are, in effect, treated as deductible expenses.[5]  See id.  Because the LIFO method matches current revenues against relatively current costs, Gertzman views the LIFO method of accounting as producing a "meaningful" or "true" measure of the gross profit from sales for a period.  Id. at 7-4 & 7-5.

For a taxpayer whose ending inventory computed under LIFO reflects the lower prices of antecedent purchases (rather than the higher price of current purchases), the income tax advantage of LIFO is obvious: a reduction in current income, leading, generally, to a reduction in current income tax.  The potential for increased gain on account of the allocation of the lower

---

[5]  In the example supra in note 4, the use of LIFO instead of FIFO increased the cost of goods sold by $0.64 (from $38.82 to $39.46).  That $0.64 represents the inflation that had occurred during the year in the cost of the 12 items that remained on hand at the end of the year ((10 units x increase in price of $0.06 a unit) + (2 units x increase in price of $0.02 a unit)).

costs of antecedent purchases to ending inventory is not eliminated, however; it is simply deferred until, in time, there is a liquidation of the items to which those lower costs have been allocated. See id. at 7-5. The term "LIFO reserve" refers to the amount by which the FIFO value (e.g., the current replacement cost) of inventory exceeds the LIFO value shown in the accounting records of the taxpayer. See id. par. 7.03[2], at 7-15.[6] It is a measure of the potential gain in a store of inventoried items on account of the use of the LIFO method.

There is more than one method for computing the value of a LIFO inventory. Id. par. 7.04[1], at 7-30. Nevertheless, all LIFO computational methods involve essentially three determinations: (1) The LIFO inventory must be segmented into groups or "pools" of similar items; (2) a determination must be

---

[6] In the example supra note 4, assuming LIFO, the LIFO reserve at the end of the year would be $0.64, calculated as follows:

```
FIFO value (current replacement cost)
of ending inventory:
     2 units at $1.04 =  $2.08
    10 units at $1.06 =  10.60
                                    $12.68

LIFO value of ending inventory:
    10 units at $1.00 = $10.00
     2 units at $1.02 =   2.04
                                    12.04
    Difference (LIFO reserve):      0.64
```

made as to whether there has been a quantitative change in the inventory of each pool during the period in question, and (3) there must be a determination of the manner in which increments to (i.e., increases in the quantity of) each pool are to be valued. Id. We are here concerned mainly with the third of those determinations.

Two basic LIFO computational methods are permitted by the income tax regulations: the specific goods method, a measure of inventory in terms of physical units of individual items, see sec. 1.472-2, Income Tax Regs., and the dollar-value method, a measure of inventory in terms of dollars, see sec. 1.472-8, Income Tax Regs. Each method is designed to make the three determinations previously identified. Gertzman par. 7.04[1], at 7-30. We are here concerned with the dollar-value method.

-- Dollar-Value Method of Valuing LIFO Inventories

Gertzman explains the dollar-value method as follows:

> Under the dollar-value method, the common denominator for measuring items within a pool is not units, such as pounds or yards, but dollars as of a particular date. Thus, a reduction in the number of inventory items within a pool will not reduce the LIFO value of the inventory as long as the total inventory stated in base-year dollars (i.e., the base [year] cost of the inventory) is not reduced. The base [year] cost of an item is generally what the item cost or would have cost at the beginning of the year for which LIFO was first adopted.

Id. par. 7.04[3], at 7-36 (fn. ref. omitted). The dollar-value method is described similarly in section 1.472-8(a), Income Tax

Regs.[7]

_____

[7] Consider the following example of the dollar-value method, based on Gertzman par. 7.04[3], at 7-37.

Assume that T (a manufacturer) began operations a number of years ago with 4 pounds of item A that cost $0.10 a pound.  Its total inventory was thus valued at $0.40.  Normal operations require the taxpayer to purchase and consume 4 pounds of A each year.  The LIFO value of its closing inventory would, thus, have remained $0.40 notwithstanding that the cost of A increased to $0.50 a pound in the interim.  Assume further, that, because of technical advantages, an equal quantity of item B may now be used in lieu of item A.  The current price of B is $0.40 a pound, and, because of the price advantage of B over A ($0.10), T, this year, purchases 4 pounds of B and consumes its remaining stock of A. Like A, B has a base-year cost of $0.10.  Under those facts, if T follows the dollar-value method with a single inventory pool that includes both items A and B, its cost of goods sold and ending inventory will be as follows:

Quantitative change in base-year cost of inventory:
Beginning inventory at base-year cost
(4 pounds of A at $0.10)                      $0.40
(0 pounds of B at $0.10)                       0.00
                                               0.40


Ending inventory at base-year cost
(0 pounds of A at $0.10)                       0.00
(4 pounds of B at $0.10)                       0.40
                                               0.40


Increase in inventory cost                     0.00

LIFO value of inventory:
Beginning inventory                            0.40
Ending inventory                               0.40

Cost of goods sold:
Beginning inventory                            0.40
Purchases (4 pounds of B at $0.40/lb)          1.60
                                               2.00
Less: Ending inventory                         0.40
Cost of goods sold                             1.60

(continued...)

Under the dollar-value method, once items have been grouped into pools, the next step is to determine whether there has been any change in the quantity of dollars invested in the pools over the year.  See Gertzman par. 7.04[3][b], at 7-44.  Those changes are determined by comparing the aggregate base-year cost of the items in a pool at the beginning of the year to the aggregate base-year cost of the items in the pool at the end of the year. See id. par. 7.04[3][b], at 7-44 to 7-45.  If the latter exceeds the former, there has been an increment in the pool; if the former exceeds the latter, there has been a liquidation of all or part of the pool.  Id. par. 7.04[3][b], at 7-45.  The base-year cost of an item in a pool is the cost of the item (or what would have been the item's cost if it had been added to the pool) as of the base date.  See id.  "Base date" is the first day of the first year for which LIFO is adopted.  Id.  A similar description

---

[7](...continued)
LIFO reserve at end of year:

| | |
|---|---|
| Replacement cost of ending inventory (4 pounds of B at $0.40/lb) | 1.60 |
| Less: LIFO value of ending inventory | 0.40 |
| LIFO reserve | 1.20 |

The dollar-value method allowed T to take full advantage of the current cost of B in determining its cost of goods sold.  By focusing solely on the change in the dollar value of T's total inventory investment, rather than the specific mix of items constituting that investment, the dollar-value method allowed T to liquidate its investment in A without incurring a tax on past inflation.  The LIFO reserve measures the potential gain built into the inventory pool.

of the procedure for measuring the change in the size of a pool is found in section 1.472-8(a), Income Tax Regs.

Under any application of the dollar-value method, it is necessary to have a means for computing the base-year costs of the items in a pool and for computing the value of any increment in, or liquidation of, the pool. Gertzman par. 7.04[3][b], at 7-45. As stated by the regulations, with respect to an increment: "In determining the inventory value for a pool, the increment, if any, is adjusted for changing unit costs or values by reference to a percentage, relative to base-year cost, determined for the pool as a whole." Sec. 1.472-8(a), Income Tax Regs. Three methods for making those computations are authorized by section 1.472-8(e)(1), Income Tax Regs.: the double-extension method, an index method, and a link-chain method. The following Example (1), based on an example in the regulations illustrating the double-extension method,[8] shows how all three methods work. Example (1) demonstrates the computation of T's ending inventory for year 1.

Example (1): T elects, beginning with calendar year 1, to compute its inventory by use of the dollar-value LIFO method. T creates Pool No. 1 for items A, B, and C. The composition of the inventory for Pool No. 1 at the base date, January 1 of year 1, is as follows:

| Items | Units | Unit Cost | Total Cost |
|-------|-------|-----------|------------|
| A | 1,000 | $5.00 | $5,000 |

---

[8] Sec. 1.472-8(e)(2)(v), Example (1), Income Tax Regs.

| | | | | |
|---|---|---|---|---|
| B | 2,000 | 4.00 | | 8,000 |
| C | 500 | 2.00 | | 1,000 |
| Total base year cost, Jan. 1, yr. 1 | | | | 14,000 |

At December 31, year 1, the closing inventory of Pool No. 1 contains 3000 units of A, 1,000 units of B, and 500 units of C. T computes the current-year cost of the items making up the pool by reference to the actual cost of the goods most recently purchased. The most recent purchases of items A, B, and C are as follows:

| Items | Purchase Date | Quantity Purchased | Unit Cost |
|---|---|---|---|
| A | Dec. 15, yr. 1 | 3,500 | $6.00 |
| B | Dec. 10, yr. 1 | 2,000 | 5.00 |
| C | Nov. 1, yr. 1 | 500 | 2.50 |

The inventory of Pool No. 1 at December 31, year 1, shown at base-year and current-year costs is as follows:

| Items | Quantity | Dec. 31, yr. 1, inventory at Jan. 1, yr. 1, base-year cost Unit Cost | Amount | Dec. 31, yr. 1, inventory at current-year cost Unit Cost | Amount |
|---|---|---|---|---|---|
| A | 3,000 | $5.00 | $15,000 | $6.00 | $18,000 |
| B | 1,000 | 4.00 | 4,000 | 5.00 | 5,000 |
| C | 500 | 2.00 | 1,000 | 2.50 | 1,250 |
| Totals | | | 20,000 | | 24,250 |

If the amount of the December 31, year 1, inventory at base-year cost were equal to, or less than, the base-year cost of $14,000 at January 1, year 1, that amount would be the ending LIFO inventory at December 31, year 1. However, since the base-year cost of the ending LIFO inventory at December 31, year 1, amounts to $20,000, and is in excess of the $14,000 base-year cost of the opening inventory for that year, there is a $6,000 increment in Pool No. 1 during that year. That increment must be valued at current-year cost; i.e., multiplied by the ratio of $24,250 to $20,000 (24,250/20,000), or 121.25 percent. The LIFO value of the inventory in Pool No. 1 at December 31, year 1, is $21,275, computed as follows:

|  | Dec. 31, yr. 1 inventory at Jan. 1, yr. 1, base-year cost | Ratio(as a percentage) of total current-year cost to total base-year cost | Dec. 31, yr. 1, inventory at LIFO value |
|---|---|---|---|
| Jan. 1, yr. 1, base cost | $14,000 | 100.00% | $14,000 |
| Dec. 31, yr. 1, increment | 6,000 | 121.25% | 7,275 |
| Totals | 20,000 |  | 21,275 |

The LIFO reserve for Pool No. 1 as of December 31, yr. 1, is $2,975, computed as follows:

| Dec. 31, yr. 1, inventory at current-year cost | $24,250 |
|---|---|
| Less: LIFO value of ending inventory | 21,275 |
| Equals: LIFO reserve | 2,975 |

-- Link-Chain Method

Where use of either an index or double-extension method is impractical or unsuitable due to the nature of the inventory in a dollar-value pool, a taxpayer may use a link-chain method of computing the LIFO value of the pool. Sec. 1.472-8(e)(1), Income Tax Regs. The regulations do not contain any examples that illustrate the computational procedures employed in using a link-chain method. Leslie J. Schneider, in his treatise, Federal Income Taxation of Inventories (2006), explains the link-chain method as follows:

> [T]he link-chain method is comparable to the double-extension method, except that the base year is rolled forward each year. Thus, instead of comparing the current-year cost and the base-year cost of each item in the ending inventory, under the link-chain method, the current-year cost and the preceding year's cost (referred to as the item's "prior-year cost") of each item are compared. This comparison is used to compute a

> one-year index, referred to as the current years' index.
> Each year's current-year index is multiplied (or
> "linked") to all preceding year's [sic] current-year
> indexes to arrive at a cumulative price index that
> relates back to the taxpayer's base year.

1 Schneider, Federal Taxation of Inventories, sec. 14.02[3][b], at

14-100.7 – 100.8 (2006) (fn. refs. omitted).[9]

The following example, <u>Example</u> (<u>2</u>), continues the facts of

<u>Example</u> (<u>1</u>).  It is based on the assumption that, as of the

beginning of year 1, in addition to electing to compute its

inventory by use of the dollar-value LIFO method, T elected to use

the link-chain method to compute the base-year and current-year

cost of its inventory pools.  <u>Example</u> (<u>2</u>) illustrates the

computation of T's ending inventory for Pool No. 1 for year 2.  An

increment in year 2 closing inventory is determined to exist at

base-year costs, and a LIFO value is assigned to that increment,

using yearly increments in cost, as shown.

<u>Example</u> (<u>2</u>):  During year 2, T completely disposes of Item A
and purchases Item D, which is properly includible in Pool No. 1.
T constructs a prior year unit cost for Item D.

|  |  | Dec. 31, yr. 2, inventory at prior-year cost | | Dec. 31, yr. 2, inventory at current-year cost | |
| --- | --- | --- | --- | --- | --- |
| Items | Quantity | Unit Cost | Amount | Unit Cost | Amount |
| B | 2,000 | $5.00 | $10,000 | $6.00 | $12,000 |
| C | 500 | 2.50 | 1,250 | 3.00 | 1,500 |
| D | 2,500 | 6.00 | 15,000 | 8.00 | 20,000 |
| Totals |  |  | 26,250 |  | 33,500 |

---

[9]  The computational procedures for the link-chain method
are described by the Commissioner in Rev. Proc. 97-36, sec.
2.04(1)(c) and (d), 1997-2 C.B. 450, 451.

(33,500/26,250 = 127.62%)

Cumulative index:
Base-year cost of Dec. 31, yr. 2, inventory:
1st year percentage link                                       121.25%
2nd year percentage link                                       127.62%
Product: chain percentage, Dec. 31, yr. 2, relative
to Jan. 1, yr. 1, base date (121.25% x 127.62%)      154.74%

Base-year cost ($33,500/154.74%)                      $21,649

The LIFO value of the inventory in Pool No. 1 at December 31, year 2, is $23,379, computed as follows:

|  | Dec. 31, yr. 2, inventory at base-year cost | Ratio (as a percentage) of current-year cost to base-year cost | Dec. 31, yr. 2, Inventory at LIFO value |
|---|---|---|---|
| Jan. 1, yr. 1, base cost | $14,000 | 100.00% | $14,000 |
| Dec. 31, yr. 1, increment | 6,000 | 121.25% | 7,275 |
| Dec. 31, yr. 2, increment | 1,649 | 154.74% | 2,552 |
| Totals | 21,649 | | 23,827 |

The LIFO reserve for Pool No. 1 as of December 31, yr. 2, is $9,673, computed as follows:

Dec. 31, yr. 2, inventory at current-year cost      $33,500
Less: LIFO value of ending inventory                  23,827
Equals: LIFO reserve                                          9,673

Example (3) continues the facts of Example (2). At base-year costs, year 3 closing inventory is less than year 2 closing inventory, indicating that a liquidation of inventory has occurred during year 3. That liquidation is reflected by the elimination of the year 2 layer of inventory and a reduction in the year 1 layer of inventory.

Example (3):

| Items | Quantity | Dec. 31, yr. 3, inventory at prior-year cost | | Dec. 31, yr. 3, inventory at current-year cost | |
|-------|----------|-----------|--------|-----------|--------|
| | | Unit Cost | Amount | Unit Cost | Amount |
| B | 1,500 | $6.00 | $9,000 | $6.00 | $9,000 |
| C | 600 | 3.00 | 1,800 | 4.00 | 2,400 |
| D | 2,500 | 8.00 | 20,000 | 7.00 | 17,500 |
| Totals | | | 30,800 | | 28,900 |

(28,900/30,800 = 93.83%)

Cumulative index:
Base-year cost of Dec. 31, yr. 3, inventory:
1st year percentage link                                    121.25%
2nd year percentage link                                    127.62%
3rd year percentage link                                     93.83%
Product:  Chain percentage, Dec. 31, yr. 3,
relative to Jan. 1, yr. 1, base date
(121.25% x 127.62% x 93.83%)                                145.19%

Base-year cost ($28,900/145.19%)                           $19,905

The LIFO value of the inventory in Pool No. 1 at December 31, year 3, is $21,161, computed as follows:

| | Dec. 31, yr. 3, inventory at base-year cost | Ratio of current-year cost to base-year cost | Dec. 31, yr. 3, inventory at LIFO value |
|---|---|---|---|
| Jan. 1, yr. 1, base cost | $14,000 | 100.00% | $14,000 |
| Dec. 31, yr. 1, increment | 5,905 | 121.25% | 7,160 |
| Totals | 19,905 | | 21,160 |

The LIFO reserve for Pool No. 1 as of December 31, yr. 3, is $9,739, computed as follows:

Dec. 31, yr. 3, inventory at current-year cost     $28,900
Less:  LIFO value of ending inventory               21,161
Equals:  LIFO reserve                                7,740

-- Preconditions to Use of LIFO Method

Use of the LIFO method for income tax purposes is dependent on

certain conditions being satisfied and a proper election to adopt
and use the method being made.  See sec. 472(a), (c); 1.472-3,
Income Tax Regs. ("Time and manner of making election.").

Huffman Group Elections

The parties have stipulated that, prior to the tax years at
issue, each member of the Huffman group filed an election to use
the link-chain, dollar-value LIFO inventory method (the link-chain
method).[10]  The parties have further stipulated that those elections
were effective for the members as of the close of their taxable
years ending as follows:  Nissan, June 30, 1979; Volkswagen, Dec.
31, 1979; Dodge and Chrysler, Dec. 31, 1989.

The Accountant's Method

The Huffman group employed an accountant (the accountant) to
compute the values of the respective inventories of each member
using the link-chain method.  The accountant was consistent in his
method (the accountant's method) of making those computations each
year, for each member, beginning with the year of each member for

---

[10]  The parties have attached documentation to the
stipulation of facts evidencing those elections.  The
documentation is inconsistent with the described elections with
respect to (1) Neil Huffman Enterprises, Inc., d.b.a. Neil
Huffman Dodge, and (2) Neil Huffman, Inc., d.b.a. Huffman
Chrysler Plymouth, in that it indicates that those corporations
elected to adopt "an index method as provided in [sec. 1.472-
8(e)(1), Income Tax Regs., * * * which] will be developed by
double extending * * * a representative portion of inventory at
beginning of year cost and current cost."  Such an index method
is distinct from the link-chain method purportedly adopted.  We
address the significance of that fact infra in sec. III.C.3.b.iii
of this report.

which it elected the link-chain method (the election year) and continuing thereafter, without exception, until the actions of respondent that led to this litigation (together, and without distinguishing among members, the election and following years). The parties have stipulated that, for each of the election and following years, the accountant omitted a computational step required by section 1.472-8, Income Tax Regs., which addresses the dollar-value method of pricing LIFO inventories. Pursuant to his method, the accountant first determined the items in each dollar-value pool at the end of each year. He then determined the current-year cost of each pool and divided that current-year cost by a cumulative index to determine the base-year cost of the pool. He compared the base-year cost so determined to the base-year cost of the pool as of the beginning of the year. When the end-of-the-year base-year cost exceeded the beginning-of-the-year base-year cost, the accountant determined that there had been an increment to the pool, but he did not multiply the increment by the cumulative index (he failed to "index" the increment) to determine a LIFO value for the increment (sometimes, the accountant's error). He assumed the LIFO value of the increment to be the difference between the end-of-the-year and beginning-of-the-year base-cost of the pool. That assumption led him to conclude that the yearend LIFO value of each pool was its value determined at base-year costs.

Under the accountant's method, for years in which he determined that there had been an increment to an inventory pool, his failure to index the increment resulted in his understating the yearend LIFO value of the pool (assuming that the cumulative index, expressed as a percent, was greater than 100%), which, in turn, resulted in (1) an unwarranted increase in his computation of the cost of the goods sold from the pool, (2) an understatement of the gross income attributable to those sales, and (3) an overstatement of the LIFO reserve attributable to the pool.[11]  For years in which he determined that an inventory pool had been liquidated in whole or in part, his past failures to have indexed any increments remaining in the pool at the beginning of the year resulted in his computing too low a cost of goods sold from the pool, which, in turn, resulted in an overstatement of the gross income attributable to those sales.  The accountant's error did not result in the permanent omission of any amount of gross income by any member.

The distortion resulting from the accountant's error can be seen in the following example:  T, a merchant, elects to compute her LIFO inventory using a dollar-value method and begins her first year under the dollar-value method (year 1) with 100 units of an inventoriable item with a base-year cost of $1.00 a unit.  Later

---

[11]  The yearend LIFO value of the pool was understated because, even under the LIFO method, inventory cannot be carried at a cost lower than the actual cost of purchasing the inventory. Cf. Fox Chevrolet, Inc. v. Commissioner, 76 T.C. 708, 732 n.15 (1981).

that year, after the wholesale price of the item has increased to $2.00 a unit, T purchases 100 units more. Unfortunately, T makes no sales during that year. Applying the accountant's method, nevertheless, T computes a cost of goods sold of $100. She reaches that result by determining the value of her ending inventory (200 units, comprising an opening inventory of 100 units plus an increment of 100 units), at base-year unit cost ($1.00) to be $200 (200 x $1.00). Since the base-year cost of her opening inventory of 100 units is $100, and she purchased 100 units during the year for $200, her cost of goods available for sale is $300, which, after subtracting the value determined for her yearend inventory ($200), results in a cost of goods sold (and a loss) of $100. Assume further that, in the next year (year 2), T decides to liquidate her inventory (200 units) and retire. She sells her inventory in bulk for $300. Her cost of goods sold is her year 2 opening inventory of $200, which results in T realizing a year 2 gain of $100. Of course, T realizes neither a loss in year 1 nor a net gain in year 2. T's failure to index the 100 unit increment included in her year 1 ending inventory distorts her income for both years 1 and 2.[12] The distortion is only matter of timing, however, since the understatement of income in year 1 is rectified by the overstatement of income in year 2. The following table

---

[12] For the 100 units purchased during year 1, the index would be 200%, reflecting the doubling during the year in the unit cost of the inventoriable item.

illustrates the distortions:

|  |  | LIFO inventory undistorted | | LIFO inventory distorted | |
|---|---|---|---|---|---|
|  |  | Yr. 1 | Yr. 2 | Yr. 1 | Yr. 2 |
| 1. | Opening inventory | $100 | $300 | $100 | $200 |
| 2. | Plus: Purchases | 200 | 0 | 200 | 0 |
| 3. | Equals: Cost of goods available for sale | 300 | 300 | 300 | 200 |
| 4. | Less: Closing inventory | 300 | 0 | 200 | 0 |
| 5. | Equals: Cost of goods sold | 0 | 300 | 100 | 200 |
| 6. | Sales | 0 | 300 | 0 | 300 |
| 7. | Less: Cost of goods sold (line 5.) | 0 | 300 | 100 | 200 |
| 8. | Equals: Gross Income from sales | 0 | 0 | (100) | 100 |

It should be noted that, if T's failure to index the year 1 increment were corrected as of the beginning of year 2 (increasing her year 2 opening inventory to $300), without any concomitant increase in her year 1 ending inventory, then $100 of gross income would go unreported (T would have a phantom loss of that amount in year 1 with no offsetting gain in year 2), unless an offsetting section 481 adjustment were made in year 2 to correct that apparent windfall.

Respondent's Examination and Adjustments

    -- The Examination

Sometime after the members of the Huffman group filed their 1999 Federal income tax returns, respondent commenced an examination of those and prior returns. Respondent identified mistakes in the members' beginning and ending inventory values

shown on those returns due to the accountant's error. Respondent revalued the members' inventories for the election and following years (beginning for Nissan and Volkswagen with 1979 and for Dodge and Chrysler with 1990 and ending for all four corporations with 1999). Those revaluations caused respondent to make adjustments to the members' gross incomes for those years. For each inventory pool, for each year, respondent proceeded as follows: He first calculated the correct yearend LIFO inventory value. Based on the correct yearend LIFO inventory value, he next calculated the correct yearend LIFO reserve. He then subtracted the correct yearend LIFO reserve from the yearend LIFO reserve calculated by the accountant. The difference, generally a positive number (the adjustment to ending inventory), is the amount that he calculated would have to be added to or subtracted from (generally added to) the yearend LIFO inventory value computed by the accountant to conform that value with the correct yearend LIFO value. To calculate any necessary adjustment to gross income for the year, respondent subtracted from the adjustment to ending inventory the similarly calculated adjustment that he had made for the prior year (except, of course, for the first year he commenced making adjustments). The difference was usually positive and would, thus, increase gross income (by, in effect, decreasing the cost of goods sold from the pool).

The following table illustrates respondent's adjustments with respect to Nissan for 1997 through 1999 (all dollar figures in thousands):

|                                          | 1997    | 1998    | 1999    |
|------------------------------------------|---------|---------|---------|
| LIFO inventory value as corrected        | $1,829  | $1,848  | $1,910  |
| LIFO reserve as corrected                | (1,048) | (1,032) | (1,009) |
| Less: LIFO reserve as reported           | (1,843) | (1,844) | (1,862) |
| Equals: Adjustment to ending inventory   | 795     | 812     | 853     |
| Less: Adj. to beginning inventory        | [1]441  | 795     | 812     |
| Equals: Yearly adjustment to income      | 354     | 17      | 41      |
| Cumulative Adjustment to income          | 795     | 812     | 854     |

[1] Adjustment to 1996 ending inventory.

Respondent's adjustment to ending inventory is a measure of the improper net increase in cost of goods sold (and net reduction in gross income) through the end of the year due to the accountant's error. It is, by definition, equal to the accountant's overstatement of the LIFO reserve as of that yearend (which overstatement is a measure of the gain in the inventory pool that should already have been recognized under the LIFO method). In appendices attached to his brief, respondent calculates the required adjustment to inventory for each member of the Huffman group for each year for which he recalculated the member's inventories and, additionally, describes the required adjustment as the "cumulative adjustment to income" for the year.

Petitioners agree that respondent's calculations of the beginning and ending inventories of each member of the Huffman

group are correct.

-- The Adjustments

Apparently because the expiration of the period of limitations on assessment and collection of tax (see sec. 6501), respondent is limited in the number of years open to adjustment by him.  The earliest year open to an adjustment by respondent is 1998 for Nissan, Dodge, and Chrysler, and it is 1997 for Volkswagen.  For the earliest and each succeeding year of a member open to adjustment by him, respondent increased or, in two cases, decreased the taxable income of the member to reflect respondent's recalculation of the member's beginning and ending inventories for the year.  The amounts of the adjustments in taxable income resulting from those recalculations, and the taxable years to which they correspond, are as follows:

| Member | 1997 | 1998 | 1999 |
|--------|------|------|------|
| Nissan | --- | $17,251 | $41,273 |
| Volkswagen | $49,056 | 35,484 | 575,137 |
| Dodge | --- | (37,752) | 256,315 |
| Chrysler | --- | 76,402 | (88,687) |

Petitioners do not contest those portions of the deficiencies that result from those adjustments.

In addition, for the earliest year of each member open to adjustment by respondent (the first year in issue), respondent made an additional adjustment under section 481.  That adjustment increased the taxable income of the member for that year to reflect the cumulative adjustments to income revealed by respondent's

recalculations for all years of the member's up until that year.
Those adjustments (the section 481 adjustments) are as follows:

| Member | 1997 | 1998 |
|--------|------|------|
| Nissan | --- | $794,993 |
| Volkswagen | $273,115 | --- |
| Dodge | --- | 348,762 |
| Chrysler | --- | 337,423 |

The parties vigorously dispute whether the section 481 adjustments (cumulatively, $1,709,293) are permissible, and it is that question that is the primary issue before us.

Change in Method of Accounting

No member of the Huffman group requested respondent's permission to change its method of accounting.

Discussion

I. Introduction

The parties are in agreement that, in computing the LIFO values of the Huffman group's yearend inventories, the accountant employed by the group omitted a computational step required by section 1.472-8, Income Tax Regs. (addressing the dollar-value method of pricing LIFO inventories). The consequence of the accountant's error was that, generally, he understated the LIFO value of those inventories (which, generally, resulted in an under-reporting of income from sales). Respondent corrected the accountant's error, and petitioners accept respondent's adjustments to the inventories of the members of the Huffman group for all of the years in issue. Petitioners do not accept, however,

respondent's determination that, in making those adjustments for the first year in issue of each member, he was implementing a change that he had made in the members' methods of accounting, which necessitated his making additional adjustments for those years pursuant to section 481(a). Petitioners argue that respondent's adjustments were merely the result of his correction of a mathematical error made by the accountant. They point out that, pursuant to section 1.446-1(e)(2)(ii)(b), Income Tax Regs.,[13] the correction of a mathematical error is explicitly excluded from constituting a change in method of accounting. Because, they argue, there was no change in any member's method of accounting, no section 481 adjustments were warranted. They concede, however, that if section 481 adjustments were warranted, respondent has correctly computed those adjustments. Our sole task is to determine whether the section 481 adjustments were warranted, which requires us to determine whether, in revaluing the members' inventories, respondent corrected a mathematical error or changed the members' methods of accounting for those inventories.

Before addressing that question, we shall discuss the relevant provisions of sections 446 and 481.

---

[13] In citing sec. 1.446-1(e)(2)(ii)(a) and (b), Income Tax Regs., we refer to that section as in effect before its revision by T.D. 9105, 2001-4 C.B. 419, 423, which replaced much of the content of that section with the substantially similar content of sec. 1.446-1T(e)(2)(ii)(a) and (b), Temporary Income Tax Regs., 69 Fed. Reg. 42 (Jan. 2, 2004).

II.  Sections 446 and 481

A.  Section 446

Section 446 prescribes certain rules with respect to methods of accounting:  A taxpayer computes its taxable income in accordance with its method of accounting, see sec. 446(a), and has some discretion in choosing a permissible method of accounting, see sec. 446(c).  Nevertheless, no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income.  Sec. 1.446-1(a)(2), Income Tax Regs.; see sec. 446(b). The regulations interpret the term "method of accounting" to include not only the taxpayer's overall method of accounting but also the taxpayer's accounting treatment of "any item."  Sec. 1.446-1(a)(1), Income Tax Regs.  In general, a taxpayer wishing to change its method of accounting must obtain the prior approval of the Commissioner.  See sec. 446(e); sec. 1.446-1(e)(2)(i), Income Tax Regs.  The regulations give guidance, but no comprehensive definition, as to what constitutes a change in method of accounting.  The regulations provide a rule of inclusion:

> A change in the method of accounting includes a change in
> the overall plan of accounting for gross income or
> deductions or a change in the treatment of any material
> item used in such overall plan.  Although a method of
> accounting may exist under this definition without the
> necessity of a pattern of consistent treatment of an
> item, in most instances a method of accounting is not
> established for an item without such consistent
> treatment.  A material item is any item which involves
> the proper time for the inclusion of the item in income
> or the taking of a deduction.  Changes in method
> of accounting include * * * a change involving the method

or basis used in the valuation of inventories * * *

Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.  The regulations also

provide certain rules of exclusion; e.g.,

> A change in method of accounting does not include
> correction of mathematical or posting errors, or errors
> in the computation of tax liability (such as errors in
> computation of the foreign tax credit, net operating
> loss, percentage depletion or investment credit).  Also,
> a change in method of accounting does not include
> adjustment of an item of income or deduction which does
> not involve the proper time for the inclusion of the item
> of income or the taking of a deduction.  For example,
> corrections of items that are deducted as interest or
> salary, but which are in fact payments of dividends, and
> of items that are deducted as business expenses, but
> which are in fact personal expenses, are not changes in
> method of accounting.  * * *

Sec. 1.446-1(e)(2)(ii)(b), Income Tax Regs.  The regulations give

no guidance as to the meaning of the term "mathematical error".

B.  Section 481

The distinction between a change in method of accounting and

the correction of a mathematical error is especially significant

because of section 481.  "Section 481 prescribes the rules to be

followed in computing taxable income in cases where the taxable

income of the taxpayer is computed under a method of accounting

different from that under which the taxable income was previously

computed."  Sec. 1.481-1(a)(1), Income Tax Regs.  For purposes of

section 481, a change in method of accounting includes a change in

the taxpayer's overall method of accounting or a change in the

taxpayer's treatment of a material item.  See id.  Section 481(a)

specifies that, in computing the taxpayer's income for the taxable

year of the change in method of accounting (year of change), there shall be taken into account those adjustments that are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted.[14]

III.  Discussion

A.  Introduction

A notable feature of section 481 is that the adjustments called for by the section may be made notwithstanding that the period of limitations on assessment and collection of tax may have closed on the years (closed years) in which the events giving rise to the need for an adjustment occurred.  See Superior Coach of Fla., Inc. v. Commissioner, 80 T.C. 895, 912 (1983).  While section

---

[14]  Sec. 481(a) provides:

SEC. 481.  ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.

(a) General Rule.--In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")--

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

481 may not necessarily conflict with the statute of limitations found in section 6501, see id., it does place a premium on distinguishing between the correction of errors (which is limited to open years) and a change in a method of accounting (which implicates section 481). Here, a determination that the accountant's error was a mathematical error would work in petitioners' favor. That is because, whether the adjustments accepted by petitioners result from the correction of mathematical errors or from accounting method changes, the adjustments result in a decrease in each member's LIFO reserves as of the beginning of the member's first year in issue, without any concomitant recognition of gain. If the adjustments result from the correction of mathematical errors, then the unrealized gains eliminated by the decreases in reserves simply escape taxation. On the other hand, if those decreases in LIFO reserves result from changes in the members' methods of accounting, then respondent's section 481 adjustments will capture the unrealized gain eliminated by the decreases in reserves.

To distinguish between error correction and an accounting method change, we must examine both the pertinent Treasury regulation and caselaw.

B. Section 1.446-1(e)(2), Income Tax Regs.

Section 1.446-1(a), Income Tax Regs., gives content to the term "method of accounting"; section 1.446-1(e)(2), Income Tax

Regs., gives guidance as to what constitutes a change in a method of accounting, and section 1.446-1(e)(2)(ii)(a), Income Tax Regs., provides that a change involving the method or basis used in the valuation of inventories is a change in method of accounting. That final provision is suggestive that respondent's adjustments, correcting the accountant's consistent failure to value properly the members' closing inventories, constitute changes in the members' methods of accounting. That suggestion is reinforced by other provisions in section 1.446-1(e)(2)(ii), Income Tax Regs., which give consistency and timing considerations an important, if not determinative, role to play in determining whether an adjustment constitutes a change in method of accounting.

As we described supra in giving the background of this case, the accountant erred in applying the link-chain method, he did so consistently for each member, beginning in the year the member elected the link-chain method and ending only when respondent found the error, the error resulted in income being under-reported for some (most) years and over-reported for other years, and, if not corrected, the error would not result in the permanent omission of income by the taxpayers. The accountant's error was an error in allocating the cost of goods available for sale during a year between the items sold during the year and the items on hand at the end of the year. Generally, under a system of inventory accounting, the value assigned to the items on hand at the end of

one year establishes the value of the items on hand at the beginning of the next year. Consequently, the accountant's error would, if applied consistently (as, in fact, it was), self correct, at least in the sense that, if the error were continued over the life of any inventory pool, the total gain reported on account of the sale of items in the pool would be correct. See, e.g., Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 509 (1989) (similar conclusion with respect to the income reported through the period in which ending inventory is correctly valued). The accountant's error was, thus, an error in timing. Because it was an error in the proper time for reporting an item of income (gain from sales), the accountant's method was a material item in each member's overall plan of accounting. See sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs. On that ground alone, respondent's change to that method would appear to be a change in a method of accounting, as that expression is used in section 1.446-1(e)(2)(ii)(a), Income Tax Regs. By consistently repeating the same error, the accountant established a pattern, which (although not determinative of) is indicative of a method of accounting. Id.

Nevertheless, section 1.446-1(e)(2)(ii)(b), Income Tax Regs., provides that a change in method of accounting does not include correction of mathematical or posting errors, and petitioners argue that, in correcting the accountant's error, respondent did no more than correct a mathematical or posting error. We have interpreted

the term "posting error" to be an error in "'the act of transferring an original entry to a ledger'". Wayne Bolt & Nut Co., v. Commissioner, supra at 510-511 (quoting Black's Law Dictionary 1050 (5th ed. 1979)). That does not describe the accountant's error, and we conclude that the accountant made no posting error. The term "mathematical error" is not, as stated, defined in the regulation, nor have we or any other court defined it for purposes of section 1.446-1(e)(2)(ii)(b), Income Tax Regs. The term does, however, appear in the Internal Revenue Code, principally in section 6213(b), which allows the unrestricted assessment and collection of tax arising out of mathematical or clerical errors. For purposes of section 6213, the term "mathematical or clerical error" is defined by section 6213(g)(2). As pertinent to this case, the definition is "an error in addition, subtraction, multiplication, or division". Sec. 6213(g)(2)(A). Moreover, before Congress provided the specific definition of the term "mathematical or clerical error" found in section 6213(g), Courts generally had limited the scope of the term "mathematical error" for purposes of section 6213(b) and its predecessors to errors in arithmetic. E.g., Farley v. Scanlon, 13 AFTR 2d 932, 933, 64-1 USTC par. 9371 (E.D. N.Y. 1964) (mathematical error "means an error in computing the tax on what the return itself concedes to be income"); Repetti v. Jamison, 131 F. Supp. 626, 628 (N.D. Cal. 1955) ("the term * * * was meant to refer to errors in

arithmetic.  This opinion is based primarily on the common meaning given to the phrase 'mathematical error,'"").  We have no reason to believe that the drafters of section 1.446-1(e)(2)(ii)(b), Income Tax Regs., intended the term "mathematical error" to have any meaning beyond its common meaning, and petitioners have failed to show us that the term has a common meaning different from the common meaning found by the District Court in Repetti; i.e., an error in arithmetic.  That definition comports with the scope of the term "posting error", with which the term "mathematical error" is associated in the regulations, and we conclude that the term "mathematical error", as used in section 1.446-1(e)(2)(ii)(b), Income Tax Regs., describes an error in arithmetic; i.e., an error in addition, subtraction, multiplication, or division.

The accountant did not make a mathematical error because he did not make an error in arithmetic.  He neither divided when he should have multiplied nor multiplied 2 x 2 and found the product to be 5.  The accountant erred in that, after deflating the current-year cost of each inventory pool to determine whether, at base-year costs, there had been an increment in the pool, and finding an increment, he failed to multiply the increment by the cumulative index in order to determine the yearend LIFO value of the pool.  The accountant reached an erroneous result not because he made a mistake in arithmetic (multiplication) but because he omitted the critical step of multiplication altogether.  That kind

of error no more lends itself to being classified as an arithmetical (mathematical) error than does the error of the baker who, having intended to double the recipe for a cake he has baked, finds that the cake has only risen half way because he failed to double the measure of baking powder called for by the recipe. Petitioners cannot avoid respondent's section 481 adjustment on the ground that respondent changed no method of accounting because he corrected only mathematical or posting errors.

Nor can petitioners avail themselves of the exceptions in section 1.446-1(e)(2)(ii)(b), Income Tax Regs., specifying that an accounting method change does not include the correction of errors in the computation of tax liability or adjustments not involving the proper time for inclusion of an item of income or the taking of a deduction.

Although section 1.446-1(e)(2)(ii), Income Tax Regs., appears dispositive in respondent's favor, our inquiry does not end there, because courts addressing the issue of whether a change in method of accounting has occurred have not uniformly given consistency and timing considerations the weight given those considerations by the regulations.

C. Caselaw

1. Introduction

In considering the caselaw dealing with what constitutes a change in method of accounting, we must distinguish between cases

decided before and after 1970.  Before 1970, courts were mostly
left to their own devices to resolve whether an accounting
adjustment rose to the level of a change in method of accounting.
In 1970, paragraphs (e)(2) and (3) of section 1.446-1(e), Income
Tax Regs., were revised by Treasury Decision.  See T.D. 7073, 1970-
2 C.B. 98 (the 1970 revision).  Included in those revisions were
the following:  The addition of the language found in paragraph
(e)(2)(ii)(a) of section 1.446-1(e), Income Tax Regs., to the
effect that, although a pattern of consistent treatment is not
necessary to establish a method of accounting for an item, "in most
instances a method of accounting is not established for an item
without such consistent treatment."  Id. at 99.  The term "material
item" (also found in paragraph (e)(2)(ii)(a)) which, before the
1970 revision, was unqualified, was redefined with the following
qualification:  "A material item is any item which involves the
proper time for the inclusion of the item in income or the taking
of a deduction."  Id.  The rules of exclusion, found in section
1.446-1(e)(2)(ii)(b), Income Tax Regs., that a change in method of
accounting includes neither mathematical or posting errors nor the
adjustment of any item of income or deduction which does not
involve the proper time for the inclusion of the item of income or
the taking of a deduction, were added.  Petitioners do not
challenge the validity of section 1.446-1(e)(2), Income Tax Regs.
(1970).

## 2. Petitioners' Argument

Petitioners' argument is as follows: "It has long been held that where a taxpayer properly elects a particular accounting method, the making by the taxpayer of an error in the use of that accounting method is an error. Thus, it logically follows that the correction of that error is not a change of accounting method." Petitioners' argument rests on the premise that a taxpayer does not change its method of accounting by deviating from it. If the premise is sound, then the taxpayer does not change its method of accounting by correcting that deviation, since before, during, and after the deviation, the taxpayer used the same method of accounting.

Petitioners can find some support for their premise in cases holding that a taxpayer does not change its method of accounting when it does no more than conform to a prior accounting election or some specific requirement of the law. Many of the cases that petitioners rely on, however, were decided before the 1970 revisions to section 1.446-1(e), Income Tax Regs., emphasizing consistency and timing considerations. Petitioners refer us to Thompson-King-Tate, Inc. v. United States, 296 F.2d 290 (6th Cir. 1961), in which the Court of Appeals held that the taxpayer had the right to change its original reporting position and report income from a construction contract in the year the contract was finally completed and accepted because the taxpayer had previously adopted

that method for reporting income from construction contracts.  Id.
at 294.  The Court of Appeals emphasized that the taxpayer had "no
election" (i.e., choice) but to report the income in the correct
year pursuant to the method of accounting it had adopted.  Id. at
294, 295.  Petitioners also cite N.C. Granite Corp. v.
Commissioner, 43 T.C. 149 (1964), and Underhill v. Commissioner, 45
T.C. 489 (1966).  In the first case, we said that a taxpayer need
not obtain the Commissioner's consent to change its method of
accounting "where the law specifically prescribes or proscribes a
method of accounting or computation".  N.C. Granite Corp. v.
Commissioner, supra at 168.  In the second case, we held that no
timing question was presented (so, therefore, the consent of the
Commissioner to change a method of accounting was not required)
when, to conform to caselaw, the taxpayer changed its method of
recovering its basis in speculative installment notes from a pro-
rata recovery method to a method that allowed it to recover all of
its basis before it reported any gain.  Underhill v. Commissioner,
supra at 496.  Because those cases were decided before 1970 and do
not address the consistency and timing considerations emphasized in
section 1.446-1(e)(2)(ii), Income Tax Regs., their weight is
uncertain.

### 3.  Post-1970 Decisions

#### a.  Primo Pants Co. v. Commissioner

This Court has generally agreed with section 1.446-

1(e)(2)(ii), Income Tax Regs., that consistency in matters of timing defines a method of accounting.[15]  For example, in Primo Pants Co. v. Commissioner, 78 T.C. 705 (1982), the petitioner arbitrarily valued its finished goods inventory at 50 percent of selling price and its materials and work in process inventories at 50 percent of cost.  The taxpayer contended that the Commissioner's adjustments to those values, eliminating the unwarranted discounts (and making certain other changes), were not a "change in the treatment of any material item".  Id. at 722.  In making that assertion, the taxpayer argued that its discounting practices had nothing to do with proper time for reporting income.  Id.  We reached the opposite conclusion, based on our inquiry whether the taxpayer's discounting practices caused its lifetime income to be underreported or merely shifted the time at which some of that income was reported.  Id. at 723.  We concluded:  "Because we are here dealing with inventory, where one year's closing inventory becomes the next year's opening inventory, we are satisfied that the present case involves only postponement of income and therefore involves a timing question."  Id.  Primo Pants Co. has been extensively cited, and we have applied a similar analysis in other cases to conclude that a change from a flawed method of determining

---

[15]  We have held that consistent treatment of an item is shown by two or more taxable years of application.  Johnson v. Commissioner, 108 T.C. 448, 494 (1997), affd. in part and revd. in part 184 F.3d 786 (8th Cir. 1999).

inventory to a correct method involves only timing questions and, thus, constitutes a change in method of accounting. See, e.g., Superior Coach, Inc. v. Commissioner, 80 T.C. at 910; Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. at 511.

Because the accountant's error in the instant case had precisely the same effect as did the taxpayer's discounting practices in Primo Pants Co.--viz, it served merely to alter the distribution of a lifetime income among taxable periods--that case would seem to govern us here, requiring us to conclude that respondent's adjustments to the members' inventories constituted a change in the members' methods of accounting. Petitioners attempt to distinguish Primo Pants Co. and the cases of the Court that follow it, but their reading of those cases is flawed. For example, on brief, petitioners discount the relevance of our holding in Primo Pants Co. because, they suggest: "No contention was made that the undervalued inventory was the result of a mathematical error." On the contrary, our report in Primo Pants Co. states: "Petitioner characterizes the various adjustments to inventory as the mere correction of its application of its lower of cost or market method of valuing inventory." Primo Pants Co. v. Commissioner, 78 T.C. at 714.

  b.  Cases Cited by Petitioners

  i.  Korn Indus., Inc. v. United States

Petitioners rely heavily on Korn Indus., Inc. v. United

States, 209 Ct. Cl. 559, 532 F.2d 1352 (1976), to support their position that respondent merely corrected mathematical errors and there were no accounting method changes. In Korn Indus., Inc. for 4 consecutive years, the taxpayer, a furniture manufacturer, deviated from its long-established method of valuing inventories. For those 4 years, the taxpayer improperly omitted certain costs from the value of its finished goods inventory, which caused a correspondingly improper addition to the cost of goods sold and, thus, an understatement of gross income. On its tax return for the fifth year, the taxpayer showed a correct beginning inventory, which included costs that had been omitted from the previous year's ending inventory. The taxpayer viewed its action as the correction of an error and not a change in its method of accounting. Therefore, it accepted the Commissioner's adjustments to its beginning and ending inventories for the 2 preceding years (for which the period of limitations on assessment and collection had not run), but it objected to the Commissioner's section 481 adjustment, which the Commissioner made to account for the disparity between the taxpayer's opening inventory for the second preceding year and its ending inventory for the third preceding year (which could not be adjusted since the period of limitations had run). If the taxpayer were right, that its method of accounting had not changed, it would enjoy, in effect, a double deduction, to the extent of the costs improperly omitted from

inventory in the first 2 years.  The Court of Claims conceded that the taxpayer had not properly accounted for the omitted costs. Nevertheless, it agreed with the taxpayer that, in revaluing its finished goods inventory for the first open year, the Commissioner had not changed its method of accounting.  Id. at 1356.  The court reasoned that the taxpayer's omissions were "inadvertent", and, thus, analogous to mathematical or posting errors, the correction of which would not have amounted to a change in method of accounting.  Id.

Taxpayers on other occasions have brought Korn Indus., Inc. to our attention.  See, e.g., Superior Coach of Fla., Inc. v. Commissioner, 80 T.C. at 912 (facts before us distinguishable from those in Korn Indus., Inc.); Wayne Bolt & Nut Co. v. Commissioner, supra at 511 (similar).  In Superior Coach, we noted that some commentators had pointed out that the good-faith exception seemingly created by Korn Indus., Inc. appears to be without statutory authorization.  Superior Coach, Inc. v. Commissioner, supra at 914 n.5.  Indeed, assuming that consistently made accounting errors are generally inadvert (i.e., made in good faith), an inadvertence-based exception to the general rule (that the consistent treatment of an item amounts to a method of accounting) would seem to swallow that general rule.  We need not resolve that conundrum today, because, as in the past, the facts before us are distinguishable from those in Korn Indus., Inc. v.

United States, supra.[16]  Unlike in Korn Indus., Inc., the
accountant's error in failing properly to apply the link chain
method neither was an interruption in a history of proper
application of that method nor was it restricted to only a portion
of the costs to be taken into account in valuing inventories.  The
facts of Korn Indus., Inc. are distinguishable.

### ii.  Evans v. Commissioner

Petitioners also refer us to Evans v. Commissioner, T.C. Memo.
1988-228.  In Evans, the question was whether individual taxpayers
on the cash method of accounting had established a different method
of accounting for employment-related bonuses by, for 3 years,
reporting such bonuses in the year in which the bonuses were
authorized rather than in the year in which they were received.
The taxpayers argued that, for those 3 years, they had merely
misapplied the cash method and, therefore, no change in accounting
method was involved when, in the fourth and fifth years, they
changed their practice of reporting bonuses, from the year
authorized to the year received, and reported the fourth year's
bonuses in year five.  We agreed, concluding that the taxpayers
never intended to adopt an accrual method of accounting for bonuses

---

[16]  Though adhering to the holding of its predecessor in
Korn Indus., Inc. v. United States, 209 Ct. Cl. 559 (1976), see
Diebold, Inc. v. United States, 16 Cl. Ct. 193, 204 n.9 (1989),
affd. 891 F.2d 1579 (Fed. Cir. 1989), the U.S. Claims Court (now
the U.S. Ct. of Fed. Claims) has emphasized the primacy of
consistency and timing in establishing a method of accounting.
See Diebold, Inc. v. United States, supra.

and their change in practice merely corrected inadvertent errors analogous to posting errors.  We cited Korn Indus., Inc. v. United States, supra.

Evans v. Commissioner, supra, is a Memorandum Opinion of this Court, and memorandum opinions are not binding.  See, e.g., Dunaway v. Commissioner, 124 T.C. 80, 87 (2005).  Moreover, the conclusion we expressed in Evans, that the taxpayer merely misapplied the cash method, appears to contradict an example in the regulations interpreting section 481.  Example (2), in section 1.446-1(e)(3)(iii), Income Tax Regs., involves a taxpayer who consistently reports its income and expenses on an accrual method of accounting except for real estate taxes, which it reports on the cash method of accounting.  The example concludes that a change in the treatment of real estate taxes from the cash method of accounting to an accrual method of accounting is a change in method of accounting because the change is a change in the treatment of a material item in the taxpayer's overall accounting practice. Finally, it is doubtful that intent plays a significant role in determining whether a taxpayer has adopted a method of accounting. See Buyers Home Warranty Co. v. Commissioner, T.C. Memo. 1998-98; see also Johnson v. Commissioner, 108 T.C. 448, 494 (1997) ("If the change affects the amount of taxable income for 2 or more taxable years without altering the taxpayer's lifetime taxable income, then it is strictly a matter of timing and constitutes a change in

method of accounting."), affd. in part and revd. in part 184 F.3d
786 (8th Cir. 1999).

  iii. Gimbel Brothers; Standard Oil

  Petitioners cite two additional cases for the proposition that
a taxpayer does not change its method of accounting when it
corrects a deviation from a previously elected method of
accounting:  Gimbel Bros., Inc. v. United States, 210 Ct. Cl. 17,
535 F.2d 14 (1976) (use of accrual method in accounting for one of
five types of credit plans following election that required
taxpayer to apply installment method to all plans was impermissible
given that election, and retroactive application of installment
method was mere correction of error);[17] Standard Oil Co. v.
Commissioner, 77 T.C. 349 (1981) (election under section 1.612-4,
Income Tax Regs., to deduct intangible drilling and development
costs meant that taxpayer "[had] no choice" but to do so, and
reversal of capitalization of some such costs was not change in
method of accounting).  Petitioners equate the elections by the
members of the Huffman Group to use the link-chain method with the
elections in those two cases, so that deviation and subsequent

---

  [17]  Gimbel Bros., Inc. v. United States, 210 Ct. Cl. 17,
535 F.2d 14 (1976), like Korn Indus., Inc. v. United States,
supra, was decided by the Court of Claims and is therefore not
binding upon us.  Further, the former case analyzes and applies
regulations in effect before 1970.  We nevertheless include the
case in this discussion because it was decided following the
issuance in 1970 of the regulations in effect for the instant
case.

adherence do not amount to changes in any accounting method. Respondent distinguishes those cases by arguing that, though the members duly elected the link-chain method, because the method was never properly applied, the Huffman Group never adopted the link-chain method.

We agree with respondent that the facts of <u>Gimbel Bros., Inc.</u> and <u>Standard Oil Co.</u> are distinguishable from those now before us. The parties have stipulated that, for each member, for the election and following years (i.e., for 10 or 20 years), the accountant omitted a computational step required by the regulations governing the dollar-value method of pricing LIFO inventories. We agree with respondent that the members may, individually, have elected the link-chain method, but no member adopted it until respondent made his corrections. That alone distinguishes the facts before us from those in <u>Gimbel Bros., Inc.</u> and <u>Standard Oil, Co.</u>, where the errors were committed in the context of a broader compliance with the taxpayer's proper method of accounting. Moreover, although stipulated by the parties, it is questionable whether all four of the members actually elected to use the link-chain method to value their respective inventories.[18] <u>Gimbel Bros., Inc.</u> and <u>Standard Oil Co.</u> are distinguished.

4. <u>Discussion</u>

There is an evident incongruity between section 1.446-

---

[18] See <u>supra</u> note 10.

1(e)(2)(ii), Income Tax Regs., which gives consistency and timing considerations an important, if not determinative, role to play in determining whether the treatment of an item constitutes a method of accounting, and the proposition, advanced by petitioners and evidenced by a body of caselaw (including cases of this Court), that a taxpayer does not change its method of accounting when it does no more than conform to a prior accounting election or some specific requirement of the law.

The notion that a taxpayer does not change its method of accounting when it merely conforms to a prescribed (but ignored) method of accounting is contradicted by at least one example in section 1.446-1(e)(2)(ii)(c), Income Tax Regs. Sec. 1.446-1(e)(2)(ii)(c), Example (1), Income Tax Regs., addresses a merchant (a jeweler) erroneously reporting income from sales on the cash method of accounting. As discussed supra under the heading "Use of Inventories", inventories and an accrual method of accounting are required when the sale of merchandise is an income-producing factor. The example holds that a change from the cash method to the accrual method is a change in the merchant's overall plan of accounting and thus is a change in method of accounting. Moreover, the notion is also inconsistent with the more recent view of the courts that a taxpayer needs the Commissioner's consent to change from an erroneous to a correct method of accounting. See, e.g., Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. at 511 ("A change in

method of accounting occurs even when there is a change from an incorrect to a correct method of accounting."), and other cases noted in Convergent Techs., Inc. v. Commissioner, T.C. Memo. 1995-320. There are also three examples in section 1.446-1(e)(2)(iii)(c), Income Tax Regs., holding that an impermissible method of accounting is a method of accounting a change from which requires the consent of the Commissioner: Examples (6), (7), and (8). We question whether there is vitality to the notion that a taxpayer conforming to a required but theretofore ignored method of accounting does not change its method of accounting by so conforming.

Consider a taxpayer that elects a method of accounting and, for some time, adheres to the method (thereby adopting it). The taxpayer then, for some time, deviates from the method before, again, adhering to it. The notion that the taxpayer did not change its method of accounting when it either, first, deviated from the method or, thereafter, adhered to the method is a notion that is narrower than the previously described notion, and it is one we have supported. See, e.g., Evans v. Commissioner, T.C. Memo. 1988-228. We have not, however, been consistent in holding that a taxpayer does not change its method of accounting when it does no more than adhere to a method adopted pursuant to a prior accounting election. See, e.g., Sunoco, Inc. & Subs. v. Commissioner, T.C. Memo. 2004-29 (retroactive attempt to change treatment of certain

mining expenses would be change in method of accounting, and not mere correction of error, where taxpayer had knowingly and consistently, albeit improperly, capitalized and amortized expenses that should have been included in taxpayer's cost of goods sold); Handy Andy T.V. & Appliances, Inc. v. Commissioner, T.C. Memo. 1983-713 (specifically finding that an impermissible change in accrual methodology was a change in method of accounting and that reversion to original methodology was a second change in method of accounting, warranting a section 481 adjustment). Indeed, in First Natl. Bank of Gainesville v. Commissioner, 88 T.C. 1069 (1987), a transferee liability case, the transferee argued that the transferor's alteration of a LIFO inventory valuation procedure constituted the correction of an accounting error and not a change in method of accounting. We held that, although the alteration in question may have constituted the correction of an error, it also constituted a change in method of accounting pursuant to section 472(e). Id. at 1085. We added: "Where the correction of an error results in a change in accounting method, the requirements of section 446(e) are applicable." Id.

Our inconsistency in holding that a taxpayer does not change its method of accounting when it does no more than conform to a prior accounting election is not necessarily inconsistent with section 1.446-1(e)(2)(ii)(a), Income Tax Regs. That is because, generally, pursuant to section 1.446-1(e)(2)(ii)(a), Income Tax

Regs., it is the consistent treatment of an item involving a question of timing that establishes such treatment as a method of accounting.  Therefore, a short-lived deviation from an already established method of accounting need not be viewed as establishing a new method of accounting.[19]  If not so viewed, neither the deviation from, nor the subsequent adherence to, the method of accounting would be a change in method of accounting.  The question, of course, is what is short-lived.  The Commissioner's position is that consistency is established for purposes of section 1.446-1(e)(2)(ii)(a), Income Tax Regs., by the same treatment of a material item in two or more consecutively filed returns.  Rev. Proc. 2002-18, 2002-1 C.B. 678.  We have said something similar. Johnson v. Commissioner, supra at 494.  We need not today determine how long is short.  Here, even if we were to assume that the members elected the link-chain method and adopted it, see supra pp. 46-48, no member deviated from the link-chain method for less than 10 years.  That is not a short-lived deviation.

D.  Conclusion

We affirm the conclusions that, tentatively, we reached supra in section III.B. of this report.  The accountant erred in applying the link-chain method.  He did so consistently, and his error was an error in timing.  It was not, within the meaning of section

---

[19]  Nor in reaching that conclusion would a court have to find that the taxpayer committed a posting or mathematical error. See sec. 1.446-1(e)(2)(ii)(b), Income Tax Regs.

1.446-1(e)(2)(ii)(b), Income Tax Regs., either a mathematical or posting error.[20]  While, in some circumstances, a taxpayer deviating from its previously established method of accounting may again adhere to its established method before the deviation has time to harden into a method of its own, the accountant's consistent error for no less than 10 years rules out that possibility.  The accountant's method was, therefore, a material item in each member's overall plan of accounting.  Respondent's change to the accountant's method (a material item) was, thus, a change in method of accounting.

IV.  Conclusion

For the first year in issue of each member, respondent's revaluation of the member's inventory constituted a change in the member's method of accounting.  Therefore, respondent's section 481(a) adjustments are permissible.  Each petitioner owning shares of stock in any member of the Huffman group must take into account his or her share of the section 481 adjustments.  We need decide no other issue.

---

[20]  It is worth mentioning that the use of price indexes in applying the dollar-value method is a matter to which Congress in sec. 472(f) and the Secretary of the Treasury in his regulations, see, e.g., sec. 1.472-8(e)(3), and revenue procedures have devoted attention.  Among the latter are Rev. Proc. 97-36, 1997-2 C.B. 450, and Rev. Proc. 97-37, 1997-2 C.B. 455  The first of those revenue procedures describes the adoption of the "Alternative LIFO Method" (a dollar-value link-chain method for retailers of autos and light-duty trucks) as a change in method of accounting.  The second likewise describes the  inventory price index computation (IPIC) method.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for respondent</u>.

[Reporter's Note:  This opinion was amended by order on Sept. 25, 2006.]