JAMES H. HAWSE & CYNTHIA L. HAWSE, Petitioners Hawse
Docket No. 8267-12 United States Tax Court
2015 U.S. Tax Ct. LEXIS 25; May 27, 2015, Filed
Decision text below is the first available text from the court; it has not been editorially reviewed by LexisNexis. Publisher's editorial review, including Headnotes, Case Summary, Shepard's analysis or any amendments will be added in accordance with LexisNexis editorial guidelines.
*25 ) Docket No. 8267-12.
v. )
)
COMMISSIONER OF INTERNAL )
REVENUE, )
)
Respondent )
ORDER
For cause, it is
ORDERED: That the Court's Memorandum Findings ofFact and Opinion filed May 27, 2015 (T.C. Memo. 2015-99), is hereby amended on page 37 to delete "Decision will be entered for respondent" and substitute in lieu thereof
"Decision will be entered under Rule 155", such that the Court's Memorandum
Findings of Fact and Opinion as so amended will read as set forth in Exhibit A attached hereto.
(Signed) Robert A. Wherry
Judge
Dated: Washington, D.C.
June 2, 2015
SERVED JUN - 3 2015
EXHIBIT A
T.C. Memo. 2015-99
UNITED STATES TAX COURT
JAMES H. HAWSE AND CYNTHIA L. HAWSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Docket No. 8267-12. Filed May 27, 2015.
During 2002 and 2003 P-H was the sole shareholder of J, an S corporation. J, an automotive dealership, accounted for its new and
used vehicles inventories on the LIFO method of accounting. For 2001 J sought automatic consent under a revenue procedure to change its method of accounting for its new and used vehicles from LIFO to specific identification, with vehicles valued at the lower of cost or market rather than actual cost. J never fully implemented the change as requested but thereafter *26 filed Federal income tax returns as if it had, reporting I.R.C. sec. 481(a) LIFO recapture income and paying the tax thereon.
In 2009 J filed amended tax returns for 2002 and 2003 purporting
to "correct" its prior returns to reflect continued use of LIFO. Ps contend that because J did not change its valuation method for all of
its vehicles inventory to lower of cost or market, J never received automatic consent and therefore remained on the LIFO method. If so,
Ps reason, they are entitled to refunds ofthe tax paid on LIFO recapture income for 2002 and 2003.
- 2 -
[*2] Held: J failed to satisfy the requirements for automatic consent under Rev. Proc. 99-49, 1999-2 C.B. 725, because it did not comply
with all terms and conditions of the revenue procedure.
Held, further, because J consistently accounted for its new and used vehicles inventory using the specific identification method on its
2001 through 2007 income tax returns, a seven-year period, J changed its method of accounting notwithstanding its failure to secure R's consent.
Held, further, J's attempt to revert to the LIFO method of accounting by filing amended returns is a change in method of accounting that requires R's consent under I.R.C. sec. 446(e).
Steven Ray Mather, for petitioners.
Halvor R. Melom, *27 for respondent.
MEMORANDUM FINDINGS OF FACT AND OPINION
WHERRY, Judge: Respondent determined deficiencies and section
6662(a)' accuracy-related penalties with respect to petitioners' 2002 and 2003
taxable years as follows:
¹Unless otherwise indicated, section references are to the Internal Revenue Code (Code) of 1986, as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules ofPractice and Procedure. Throughout this opinion we refer to the income tax regulations in effect for the tax years at issue.
- 3 -
[*3] Penalty
Year Deficiency sec. 6662(a)
2002 $2,892,317 $578,463.40
2003 1,604,752 320,950.40
After the parties' filing of a stipulation of facts, a stipulation of settled issues, and a supplemental stipulation of settled issues, which are by this reference
incorporated herein, the only remaining issues for decision are:
(1) whether for 2001 and the tax years at issue JHH Motor Cars, Inc. (JHH),
petitioner James H. Hawse's wholly owned S corporation, received automatic
consent to change its method of accounting for its new and used vehicles
inventories (vehicles inventory) from LIFO to specific identification;
(2) ifnot, whether JHH changed that method ofaccounting *28 for the years
2001 through 2007 notwithstanding its failure to secure respondent's automatic
consent; and
(3) if so, whether JHH's attempt in 2009 to revert to the LIFO method of
accounting for its vehicles inventory by filing amended income tax returns for 2002 and 2003 constitutes a proposed second change in accounting method which would be permissible only with respondent's consent.
- 4 -
[*4] FINDINGS OF FACT
Petitioners James H. Hawse and Cynthia L. Hawse resided in California on the date the petition was filed.² At all relevant times, Mr. Hawse was the president
and sole shareholder of JHH, a subchapter S corporation.3
JHH was incorporated under the laws of the State of California in 1984. Its original name was Taylaurel Motors, Inc., which it changed to Sierra Toyota, Inc., in 1985 and then to JHH Motor Cars, Inc., in 2001. During the tax years at issue
JHH sold new Toyota and Mitsubishi vehicles and used vehicles and operated a
full service automobile repair and parts department.
JHH's Method of Accounting
On September 10, 1985, JHH (under its former name Sierra Toyota, Inc.) elected to use the last-in, first-out (LIFO) method of accounting for its vehicles inventory.4 JHH made that election *29 by filing Form 970, Application To Use LIFO
2The venue for appeal of this case is the U.S. Court of Appeals for the Ninth Circuit both because petitioners resided within its jurisdiction when they filed their petition, see sec. 7482(b)(1)(A), and because, in any event, the parties have so stipulated, see sec. 7482(b)(2).
3Following the general rule for S corporations, see sec. 1378(b), JHH was a calendar year taxpayer.
4LIFO is one of two alternative cost flow assumptions generally used for financial accounting and tax purposes to compute a taxpayer's cost of goods sold.
(continued...)
- 5 -
[*5] Inventory Method, with the Internal Revenue Service (IRS). JHH did not make a similar LIFO election for its parts inventory (non-LIFO inventory), which
it identified using the specific identification method and valued on the basis of
lower of cost or market.5
In early 2001, Mr. Hawse, anticipating that he might sell his dealership at
some point given the interest expressed by potential buyers, sought to terminate
4(...continued)
Under the other assumption, first-in, first-out (FIFO), it is assumed that the first goods acquired or produced are the first goods sold and that the goods remaining in ending inventory are the last goods acquired or produced. *30 Under LIFO, it is assumed that the last goods acquired or produced are the first goods sold. "[T]he overriding purpose of * * * LIFO * * * is to match current costs against current income." UFE, Inc. v. Commissioner, 92 T.C. 1314, 1322 (1989).
For a taxpayer in an inflationary environment whose ending inventory, computed under LIFO, reflects the lower prices of antecedent purchases (rather than the higher prices of current purchases) and as a consequence a higher cost of goods sold, LIFO boasts an obvious advantage: a reduction in current income, leading, generally, to a reduction in current income tax. The potential for increased gain on account of the allocation ofthe lower costs of antecedent purchases to ending inventory is not eliminated, however; it is simply deferred until, in time, there is a liquidation ofthe items to which those lower costs have been allocated. See Huffman v. Commissioner, 126 T.C. 322, 324-326 (2006)
(providing a detailed explanation of the LIFO method of accounting), B 518
F.3d 357 (6th Cir. 2008).
5An inventory identification method differs from an inventory valuation method. On Form 3115, Application for Change in Accounting Method, the taxpayer must provide information for both his present and proposed inventory identification methods (LIFO, FIFO, or specific *31 identification) and inventory valuation methods (cost; cost or market, whichever is lower; retail cost; retail, lower of cost or market; or other).
- 6 -
[*6] JHH's LIFO election because he viewed the LIFO method as an impediment
to the eventual sale of his business. Mr. Hawse's specific concern, as he framed it
at trial, germinated from the accumulated LIFO reserve that either he or the purchaser might have to recapture ifhe sold the dealership.6 Mr. Hawse felt that generally buyers prefer an asset sale to a stock purchase because they do not want
to take on the potential corporate or personal income tax liability associated with
an unrecaptured LIFO reserve. In the event ofan asset sale, JHH would have to
recapture the entire LIFO reserve and Mr. Hawse as its sole shareholder would have to pay tax on it in a single tax year. Because a taxpayer generally must
obtain IRS consent to any change in its method of accounting, sg sec. 446(e), JHH attempted to follow the automatic consent procedure in Rev. Proc. 97-37, 1997-2 C.B. 455.
JHH filed with the IRS an application for automatic consent to revoke its
LIFO election for the vehicles inventory in favor ofthe specific identification
method. It did so principally by attaching Form 3115 to its timely *32 filed 2001 Form
1120S, U.S. Income Tax Return for an S Corporation. On that Form 3115 JHH
6The LIFO reserve with respect to a pool of inventory is the difference between the accounting cost of that inventory calculated using the FIFO method and the cost calculated using the LIFO method. It measures the potential built-in gain in the inventory as a result ofusing the LIFO method in an inflationary or rismg price economy.
- 7 -
[*7] stated that it was requesting permission to change its method of accounting
for its vehicles inventory pursuant to the automatic consent provisions of Rev. Proc. 97-37, sup a, and that the change would take effect for tax year 2001.
JHH further stated that it currently identified its vehicles inventory using the
LIFO method and valued it at cost and that going forward it would identify that inventory using the specific identification method and would value it at the lower
of cost or market. Form 3115 made clear that JHH's use of the specific
identification method for its non-LIFO inventory and its valuation of that inventory at the lower of cost or market would remain unchanged. The table
below summarizes the information JHH presented on Form 3115: Identification Identification method *33 used before method used after LIFO Inventory LIFO termination termination Vehicles inventory LIFO Specific identification . Non-LIFO inventory Specific identification Specific identification Valuation Valuation method used before method used after LIFO Inventory LIFO termination Termination Vehicles inventory Actual cost Lower of cost or market Non-LIFO inventory Lower of cost or market Lower of cost or market - 8 -
[*8] JHH also stated on Form 3115 that it would make the necessary section
481(a) adjustment by including in income, or recapturing, its stored LIFO reserve
of $1,084,4377 over a period of four years--$271,109 per year for each of2001,
2002, 2003, and 2004.8 JHH did not attach a statement explaining how its
proposed new methods of identifying and valuing its vehicles inventory were consistent with the requirements of section 1.472-6, Income Tax Regs., or how these methods conformed to the requirements of Rev. Proc. 97-37, app. sec. 10.01,
1997-2 C.B. at 476. Mr. Hawse, JHH's president and sole shareholder, signed
Form 3115, and JHH filed a copy with the IRS National Office.
7JHH's Form 3115 shows values for the ending vehicles inventory for year
2000 computed under the old method (LIFO at cost) and the new method (specific identification at the lower *34 of cost or market). Nothing in the record explains how the ending vehicles inventory value under the new method was calculated. JHH's
accountant's generalized statements during the trial seem to indicate that the difference between the two ending inventories should be equal to the accumulated
LIFO reserve, $1,084,437, that was recaptured. The difference, however, is not equal to the accumulated recaptured LIFO reserve. The record does not provide an explanation for the apparent discrepancy.
8In the case of a change from LIFO to some other method of accounting, sec. 481(a) requires the recapture of LIFO reserve for the year ofthe change and thus prevents the accumulated LIFO reserve from escaping taxation. Rev. Proc.
97-37, sec. 5.03 and 5.04(1), 1997-2 C.B. 455, 459, permits a taxpayer to recapture this LIFO reserve over a period of four years--the four-year spread.
Accord Rev. Proc. 99-49, sec. 5.04(1), 1999-2 C.B. 725, 732.
_ 9 _
(*9] Consistent with its affirmations on Form 3115, on its 2001 through 2007
income tax returns JHH used the specific identification method of accounting for all of its inventory (vehicles and non-LIFO inventory). JHH also made the section
481(a) adjustment, reporting income of $271,109 under "RECAPTURE LIFO
RESERVE", on each of its 2001, 2002, 2003, and 2004 *35 income tax returns.
However, contrary to its representation on Form 3115 that it would value all
of its inventory at the lower of cost or market, JHH in fact used different valuation
approaches for its various inventories. It used actual cost for new vehicles, lower
of cost or wholesale market for used vehicles, and lower of cost or market for
parts. Neither JHH's 2001 income tax return nor its Form 3115 disclosed these
various approaches. That JHH used these various inventory valuation approaches
could be gleaned only from its yearend financial statements.
At no point after JHH filed Form 3115 did respondent advise JHH, in
writing or otherwise, that the IRS had rejected JHH's application for automatic
consent or that its application was in any way defective.
JHH's Amended Returns
During the years 2001, 2002, and 2003 Kruse Mennillo LLP (Kruse
Mennillo) provided accounting services to JHH. JHH had worked with Kruse
Mennillo since 1998. Kruse Mennillo reviewed JHH's financial statements,
- 10 -
[*10] provided tax preparation services and inventory valuations, and worked on various other special projects that might come up during the year. With respect to
inventory valuations, all inventory valuations *36 on the operational level were done
in-house by JHH personnel except that at the end ofthe year Kruse Mennillo
would calculate the LIFO yearend inventory and determine the LIFO reserve
amount on the basis of that calculation.
During the years 2001, 2002, and 2003 Victor Kawana was the managing
partner ofthe Cerritos, California, office ofKruse Mennillo and was in charge of
JHH's account. At some point before March 10, 2009, Mr. Kawana attended an
online seminar, or webinar. Petitioners and Mr. Kawana contend that: (1) IRS
Motor Vehicle Technical Specialist Terri Harris participated in that webinar and
(2) Ms. Harris represented during the webinar that the IRS was rejecting Forms
3115 filed by taxpayers whose post-LIFO-termination methods of inventory
valuation were not identical for all inventory employed in their businesses.9
9We do not, and need not, make any finding of fact as to whether these events occurred as petitioners and Mr. Kawana contend because the accuracy of their contentions will not affect the outcome of this case. We note, however, that Mr. Kawana does not recall the specific day, week, or month in which the webinar allegedly occurred, and no recording, transcript or other corroborative *37 record of the webinar was offered into evidence. Moreover, Ms. Harris has attended approximately two webinars since assuming the position of IRS Motor Vehicle
Technical Specialist in 2001. She credibly testified that she does not recall
(continued...)
- 11 -
[*11] After allegedly hearing Ms. Harris' statements during the webinar, Mr.
Kawana met with Willard De Fillips, an auto dealership industry professional who
advises on LIFO accounting method issues, to discuss the status ofJHH's LIFO
termination. From his conversation with Mr. De Fillips, Mr. Kawana understood
that Mr. De Fillips considered JHH's LIFO termination problematic.
Mr. De Fillips also publishes a newsletter, "The LIFO Lookout", that
addresses various issues related to LIFO inventories. Mr. Kawana's firm, Kruse
Mennillo, subscribes to it. The spring 2008 edition ofthe LIFO Lookout
addressed the validity of automatic LIFO termination applications. Specifically,
Mr. De Fillips advised his readers in the LIFO Lookout that: (1) recently, the IRS
National Office had been rejecting Forms 3115 that were filed for automatic
terminations ofLIFO elections; (2) this fact had been further confirmed by his
meeting with an IRS motor vehicle technical *38 adviser; and (3) it appeared that the IRS' position was that dealerships could not use the automatic change provisions to terminate the LIFO method if, after filing their LIFO termination applications,
the dealerships did not use the same method of inventory valuation for all oftheir
9(...continued)
attending any webinar where she discussed the subjects alleged or otherwise had any specific discussions with petitioners or their representatives concerning LIFO termination.
- 12 -
[*12] non-LIFO inventory. Mr. De Fillips posited that in such a case filing
amended returns might be one acceptable way ofreverting to the LIFO method
and correcting a defective LIFO termination.
On the basis ofthe foregoing information, Mr. Kawana advised Mr. Hawse
that JHH should file amended returns to reinstate the LIFO method for vehicles
inventory and to reverse the related section 481(a) adjustments. On March 10,
2009, with Mr. Hawse's approval, JHH filed amended income tax returns for tax years 2002 through 2007, stating that "the amended tax returns reflect the valuation of the taxpayer's new inventory at LIFO, consistent with its prior
election." JHH did not file an amended return for 2001 because the period of
limitations *39 for that year had presumably expired.'° Instead, JHH included the
adjustments for 2001 in its amended return for 2002.
On its amended returns for 2002 and 2003, the years at issue here, consistent with its goal of reverting to the LIFO method, JHH reversed the section
481(a) adjustment that it had earlier made, computed additional LIFO reserve
amounts (LIFO "layers") for years 2001, 2002, and 2003 and claimed deductions
for these additional LIFO reserve amounts on its 2002 and 2003 amended returns.
¹°Years 2002 and 2003 were still open because JHH's returns for those years were under examination by the IRS and period of limitations extensions had
apparently been obtained.
- 13 -
[*13] The adjustments on JHH's 2002 and 2003 amended returns attributable to its
attempted reversion to the LIFO method and the resulting disputed income
adjustments are in the following amounts: Reversal of Contested sec. 481(a) LIFO Reserve reduction in Year adjustment (LIFO Layers) income 2002 ¹$542,218 ²$32,000 $574,218 2003 271,109 31,000 302,109 ¹On its 2002 amended return JHH deducted $542,218 for the reversal ofthe sec. 481(a) adjustment, $271,109 for 2001 and $271,109 for 2002.
²Because the original 2001 and 2002 tax returns did not use LIFO *40 for vehicles inventory, on its 2002 amended return JHH deducted $32,000 for its approximated LIFO reserve. Of this amount, $11,000 was for 2001 and $21,000 was for 2002. The $31,000 LIFO reserve amount for 2003 was also an approximation.
JHH claimed refunds on its 2002 and 2003 amended returns as a result of these adjustments.
On January 6, 2012, respondent mailed petitioners a notice of deficiency for
tax years 2002 and 2003. Petitioners timely filed a petition with this Court. The
parties resolved all deficiency issues before trial, leaving only petitioners' refund
claims for litigation.¹¹
¹¹In a deficiency case such as this one, sec. 6512(b)(1) grants this Court
(continued...)
- 14 -
[*14] OPINION
As a general rule, a taxpayer's "[t]axable income shall be computed under
the method of accounting on the basis ofwhich the taxpayer regularly computes
his income in keeping his books." Sec. 446(a). Ifthe taxpayer desires to
"change[] the method of accounting on the basis ofwhich he regularly computes his income in keeping his books", he must, "before computing his taxable income under the new method, secure the consent of the Secretary." Sec. 446(e).
"Consent must be secured whether or not such method is proper or is permitted under the *41 Internal Revenue Code or the regulations thereunder." Sec. 1.446-1(e)(2)(i), Income Tax Regs.
To secure the Commissioner's consent to an accounting method change, a
taxpayer may either: (1) file a properly completed "Form 3115 with the
Commissioner during the taxable year in which the taxpayer desires to make the change in method of accounting" and await an affirmative grant of consent, see id. subpara. (3)(i), or (2) comply with the terms and conditions for obtaining consent under any administrative procedures promulgated by the Commissioner for that
purpose, see id. subdiv. (ii). Rev. Proc. 99-49, 1999-2 C.B. 725, provides for
"(...continued)
jurisdiction to determine the amount of a taxpayer's overpayment, if any, and provides that any overpayment so determined shall be refunded to the taxpayer.
- 15 -
[*15] automatic consent upon compliance with its terms and conditions and
embodies those administrative procedures for the tax year for which JHH
attempted to terminate its LIFO election.'2
We first consider whether JHH complied with these terms and conditions
and thereby secured automatic consent.
I. Automatic Consent Under Rev. Proc. 99-49
Petitioners' threshold contention is that JHH never received automatic
consent to the revocation of its LIFO election. Petitioners point to Rev. Proc. 97-
*42 37, app. sec. 10.01(1)(b)(i)(A), which they contend conditions automatic consent
¹²At trial and in their posttrial briefs the parties consistently referenced Rev.
Proc. 97-37, supra, and framed their arguments on the basis of its provisions. That revenue procedure was superseded by Rev. Proc. 98-60, 1998-2 C.B. 759. Rev.
Proc. 98-60, supra, was, by its terms, effective for tax years ending on or after
December 21, 1998. I1. sec. 13.03, 1998-2 C.B. at 769. We refer to its effective date in the past tense because Rev. Proc. 98-60, supra, was itself superseded by
Rev. Proc. 99-49, supra, effective for tax years ending on or after December 27,
1999, including JHH's 2001 tax year. Rev. Proc. 99-49, secs. 1, 13.02, 1999-2
C.B. at 728, 737. Rev. Proc. 99-49, supra, was later superseded by Rev. Proc. 2002-9, 2002-1 C.B. 327, effective for tax years ending on or after January 7,
2002. Rev. Proc. 2002-9, secs. 1, 13.01, 2002-1 C.B. at 334, 345.
When JHH sought to change its method of accounting for its tax year ending December 31, 2001, Rev. Proc. 99-49, supra, provided the applicable procedure for obtaining automatic consent. We will rely upon it in our analysis rather than upon the superseded procedure cited by the parties, who now agree that it, rather than Rev. Proc. 97-37, supra, exclusively governed JHH's automatic consent application. The relevant portions ofthe two procedures differ only minimally, and we note such differences in our analysis.
- 16 -
[*16] on JHH's adoption, in practice, *43 ofthe same inventory valuation method for
all of its vehicles inventory as it used for its non-LIFO inventory. Rev. Proc. 99-
49, app. sec. 10.01(1)(b)(i)(A), 1999-2 C.B. at 752, contains wording identical to that cited by petitioners. Compare Rev. Proc. 97-37, 1997-2 C.B. at 476, with
Rev. Proc. 99-49, 1999-2 C.B. at 752.
As we found, for 2001 and subsequent years JHH did not use the same valuation method for all of its vehicles and non-LIFO inventory. In petitioners' view, a taxpayer must actually follow through on its representations on Form 3115 for automatic consent to be granted. Consequently, they reason, JHH's application
was fatally defective, and JHH retained its historic LIFO method during the tax
years at issue.
In respondent's view, a taxpayer need only comply with the applicable
revenue procedure's requirements in filing Form 3115 to obtain automatic consent; for the consent to be effective, the taxpayer need not, as a factual matter, implement the changes requested on the form. Respondent asserts that JHH complied with all relevant provisions of Rev. Proc. 97-37, sup_ra, and that as a result, consent was automatically granted.
To resolve this dispute, we must identify the terms and conditions ofRev.
Proc. 99-49, supra, and then determine whether JHH met them.
- 17 -
[*17] A. What the Revenue Procedure Said
As with any *44 question of textual interpretation, the starting point for our analysis must be the text itself. See, e.g., Ford Motor Co. v. United States, 768
F.3d 580, 591-593 (6th Cir. 2014) (assessing parties' competing interpretations of
a revenue procedure, on the basis of its specific wording, before considering their
consistency with its general policy and structure); Dillon, Read & Co., Inc. v.
United States, 875 F.2d 293, 298 (Fed. Cir. 1989) (examining wording ofrevenue
procedure and interpreting it by applying maxim of statutory construction); see also Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980) (observing that "the starting point for interpreting a statute is the language
of the statute itself").
The revenue procedure's text reveals that to use the automatic consent procedure, a taxpayer must be seeking consent to change from a method of
accounting described in the revenue procedure's appendix to a method of accounting described in that appendix. Rev. Proc. 99-49, secs. 1, 4.01, 1999-2 C.B. at 728, 731. Pursuant to the appendix, a taxpayer using the LIFO inventory method is eligible to seek automatic consent ifthe taxpayer proposes to change
from the LIFO method for all of its LIFO inventory to the "permitted method".
See id. app. sec. 10.01(1)(a), 1999-2 C.B. at 752. For a non-farmer, non-
- 18 -
[*18] securities-dealer taxpayer, a "permitted method" is one which: *45 (1) identifies inventory using FIFO or specific identification and (2) values that inventory at cost, at the lower of cost or market, or, if the taxpayer is a retail merchant, via the
retail method. Id. sec. 10.01(1)(b)(ii). Ifthe taxpayer has non-LIFO inventory for
which it already uses one ofthese permitted methods, then that method constitutes the only permitted method to which the taxpayer may seek to change its LIFO
inventory under the revenue procedure. See id. sec. 10.01(1)(b)(i)(A).'³
¹³Petitioners misinterpret these eligibility requirements as terms and conditions, actual compliance with which is required to obtain automatic consent.
The wording and structure ofthe revenue procedure do not support their interpretation. More to the point, adopting that interpretation would vitiate the revenue procedure's scheme of automatic consent and run contrary to the clear mandate of sec. 446(e) by placing final determinative power over the issuance of the Commissioner's consent in the taxpayer's hands.
Rev. Proc. 99-49, supra, refers to "automatic" consent, but this label is something of a misnomer. The automatic consent procedure merely allows a taxpayer to assume consent once all predicate procedures have been properly followed and requirements met, subject *46 to the Commissioner's oversight. After a taxpayer secures automatic consent to a change in method of accounting, the District Director may thereafter recommend that the change be modified or revoked if, upon review, he or she discovers that the change was based on inaccurate factual representations, that taxable income adjustments required for a change in accounting method were not made under sec. 481(a), or that applicable procedures were not followed. Rev. Proc. 99-49, sec. 9.01, 1999-2 C.B. at 736.
Consent granted automatically remains revocable for cause.
Petitioners' theory would effectively shift the Commissioner's power to grant automatic consent to the taxpayer. The taxpayer would determine, after filing a complete and accurate Form 3115 along with the relevant return, whether
or not to follow through on his affirmations on Form 3115, and consequently
(continued...)
- 19 -
[*19] A taxpayer meeting these eligibility requirements may secure automatic consent to change its method of accounting by complying with the "applicable provisions" ofthe revenue procedure. S_e_e Rev. Proc. 99-49, sec. 6.01, 1999-2
C.B. at 733. More specifically, to obtain automatic consent, a taxpayer must:
(1) submit before or with its timely filed income tax return for the year of
the change Form 3115 signed *47 by an individual with authority to bind the taxpayer,
sec. 6.02(2)(a), (4), 1999-2 C.B. at 733;'4
(2) file a copy ofthat Form 3115 with the IRS National Office no later than
the date on which the original tax return is filed, & sec. 6.02(2)(a);
(3) cite on Form 3115 the applicable section ofthe revenue procedure's
appendix, 4 sec. 6.02(3)(a);
'3(...continued)
whether the Commissioner in fact consented. Where, as here, the taxpayer files returns consistent with those affirmations but does not abide by them in practice, the Commissioner would have no way of knowing that he never consented. The Commissioner's consent would turn on the taxpayer's unreported, undisclosed inventory practices. Such an absurd result would render sec. 446(e) toothless.
¹4Sec. 1.446-1(e)(3)(i), Income Tax Regs., requires that Form 3115 be filed
"with the Commissioner during the taxable year in which the taxpayer desires to make the change in method of accounting." The revenue procedure, issued under the authority of sec. 1.446-1(e)(3)(ii), Income Tax Regs., modifies this requirement. Rev. Proc. 99-49, sec. 6.02(1), 1999-2 C.B. at 733.
- 20 -
[*20] (4) attach to Form 3115 statements (a) identifying the taxpayer's new
method of identifying its inventory, (b) identifying the taxpayer's new method of valuing its inventory, and (c) describing "in detail" how those methods conform to the *48 requirements ofRev. Proc. 99-49, app. sec. 10.01(4), 1999-2 C.B. at 753; and
(5) if a section 481(a) adjustment is required, make that adjustment over a
period of four years beginning with the year ofthe election, id. sec. 5.03-5.04, 1999-2 C.B. at 732.15
B. What JHH Did
On its Form 3115 JHH showed that it was eligible to apply for automatic
consent. JHH unambiguously represented that it currently identified its vehicles
inventory using the LIFO method and valued that inventory at cost, that it
identified its non-LIFO inventory using the specific identification method and
¹sIn addition to these listed provisions, both Rev. Proc. 97-37, sec.
6.02(5)(a), 1997-2 C.B. at 461, and Rev. Proc. 98-60, sec. 6.02(5)(a), 1998-2 C.B. at 766, required a taxpayer to include with Form 3115 an attachment stating that the taxpayer agreed to the revenue procedure's terms and conditions. JHH did not comply with this requirement, but as of the date JHH applied for automatic consent, the requirement had been eliminated. See Rev. Proc. 99-49, sec. 2.11(3),
1999-2 C.B. at 729.
JHH used the May 1999 revision ofForm 3115. At line 6b of Part II,
Change in Valuing Inventories, of Schedule C, Change in the Treatment ofLong-
Term Contracts, Inventories or Other Section 263A Assets, that version ofForm 3115 directs a taxpayer changing from the LIFO method to attach "[a] statement describing how the proposed method is consistent with the requirements of
Regulations section 1.472-6 *49 ." JHH did not attachment this statement.
- 21 -
[*21] valued that inventory using the lower of cost or market approach, and that it
proposed to identify its vehicles inventory using the specific identification method
and to value it at lower of cost or market.
JHH also complied with some--but not all-ofthe revenue procedure's
application requirements. JHH attached Form 3115 to its timely filed 2001
income tax return, designating 2001 as the year for which the change was to take effect, and also filed a copy with the IRS National Office. On its Form 3115 JHH
stated that the form was filed pursuant to the automatic consent procedure ofRev.
Proc. 97-37, supra. Mr. Hawse, who as JHH's president ostensibly had authority
to bind the corporation, signed the form. Further, JHH agreed on the form that it would make the necessary section 481(a) adjustment and stated that the section
481(a) adjustment resulting from the change of accounting method would be a recapture ofLIFO reserve of $1,084,437 over a period of four years. Consistent with its statements on Form 3115, on its 2001 tax return JHH accounted for its
vehicles and non-LIFO inventory according to the specific identification method and reported income of $271,109 *50 for that year's 25% share of the LIFO reserve
recapture.
JHH did not, however, cite on Form 3115 the applicable section ofthe
revenue procedure's appendix. Nor did it attach to Form 3115 a separate
- 22 -
[*22] statement describing how its new methods of identifying and valuing its
inventory conformed to the requirements of Rev. Proc. 97-37, app. sec.
10.01(1)(b)(i).
At first blush these two defects may appear trivial, but the revenue
procedure itself demands strict compliance: "[A] taxpayer * * * [that] changes to
a method of accounting without complying with all the applicable provisions of
this revenue procedure" has not obtained the Commissioner's consent.¹6 See Rev.
Proc. 99-49, sec. 6.06, 1999-2 C.B. at 735 (emphasis added).
This strict compliance standard makes sense. Section 446(e) mandates that taxpayers seek the Commissioner's consent to changes in their methods of accounting. The Commissioner is "vested with a wide discretion in deciding
'6When the Court determined that Rev. Proc. 97-37, supra, had been superseded by Rev. Proc. 99-49, supra, we sought comment from the parties on which procedure should apply and on the effect of any differences between them.
In the status report he submitted in response to the Court's request, respondent argues that we should disregard JHH's *51 omission of the attachment under the substantial compliance doctrine. See, e.g., Staples v. Commissioner, T.C. Memo.
2013-262, at *8 (explaining that, where in making an election a taxpayer omits one or more regulatory requirements, "if the requirements are procedural or directory, in that they do not go to the essence ofthe thing to be done but rather are given with a view to the orderly conduct ofbusiness, they may be fulfilled by substantial compliance"). Respondent contends that the requirement for the attachment to Rev. Proc. 99-49, supra, is merely procedural, that the information that should have been included in the attachment appeared elsewhere on JHH's Form 3115, and that JHH therefore substantially complied. For the reasons set forth in the text, we decline to adopt this reasoning.
- 23 -
[*23] whether to permit or to forbid a change." Brown v. Helvering, 291 U.S.
193, 204 (1934). As a general rule, when a taxpayer requests consent to a change
in method of accounting, the Commissioner's consent to that request must be affirmative to be effective--that is, the Commissioner must notify the taxpayer its request has been granted. S_ee sec. 1.446-1(e)(3)(i), Income Tax Regs. Although
the Commissioner has elected to define the terms under *52 which his consent to a request may be presumed, see id. subdiv. (ii); Rev. Proc. 99-49, supra, presuming
consent when a taxpayer's request varies from those terms would be antithetical to
the concept of discretion and would undermine the purposes of section 446(e), s_ee,
eg, Barber v. Commissioner, 64 T.C. 314, 319-320 (1975) (explaining that
treatment of a taxpayer's election of an accounting method as binding absent
consent ofthe Commissioner to a change serves to, inter alia, "prevent
administrative burdens and inconvenience in administering the tax laws" as well
as "to promote consistent accounting practice thereby securing uniformity in
collection ofthe revenue").
- 24 -
[*24] Consequently, we hold that because JHH did not comply with all the terms
and conditions ofRev. Proc. 99-49, supra, its application for automatic consent
failed."
"Petitioners additionally argue that the IRS, through its agent and representative Ms. Harris, acceded to their view that JHH's failure to in fact adopt the method of accounting change it sought on Form 3115 precluded it from obtaining automatic consent. This argument implicates the equitable estoppel doctrine. Because we have held on another basis that JHH did not receive automatic consent, we need not closely scrutinize this argument. Nevertheless, we *53 note that petitioners have not established the elements of an equitable estoppel claim against respondent. See Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 60
(1995) (describing the requirements for an equitable estoppel claim against the
Government as "(1) [a] false representation or wrongful, misleading silence by the
party against whom" estoppel is claimed; "(2) an error in a statement of fact and not in an opinion or statement of law; (3) ignorance of the true facts" by the
taxpayer; "(4) reasonable reliance [by the taxpayer] on the acts or statements of the one against whom estoppel is claimed; and (5) adverse effects" suffered by the
taxpayer as a result "of the acts or statement ofthe one against whom estoppel is claimed"), supplemented by 104 T.C. 417 (1995), aff'd, 140 F.3d 240 (4th Cir.
1998).
We find petitioners' evidence of Ms. Harris' representative status and alleged statements unpersuasive. See supra note 9. Moreover, petitioners have not refuted her testimony that, at speaking engagements, she always advises her audience that her statements represent her personal views, not those of the IRS. Petitioners could not have relied reasonably upon Ms. Harris' personal opinions. Moreover, whether or not Ms. Harris said what petitioners and Mr. Kawana claim *54 she said, a Government agency like the IRS is not bound by the unauthorized statements of its agents. See, e.g., Posey v. United States, 449 F.2d 228, 234 (5th
Cir. 1971) ("[I]t is well established that the Government is not bound by the unauthorized or incorrect statements of its agents."); Sanders v. Commissioner,
225 F.2d 629, 634 (10th Cir. 1955) ("[T]he United States may not be estopped by the unauthorized acts of its agents nor may such agents waive the rights of the
United States by their unauthorized acts."), a_ffg 21 T.C. 1012 (1954), and rev'g
(continued...)
- 25 -
[*25] II. Changes in Accounting Method
We have concluded JHH did not receive automatic consent to terminate LIFO for its vehicles inventory and to use specific identification, lower of cost or
market, for all inventory. As a result, we must resolve two further issues.
First, we must decide whether, notwithstanding its failure to secure respondent's automatic consent in 2001, JHH's filing of its 2001 through 2007 tax returns in accordance with a new method of accounting was a change in method of
accounting. If so, second, we must ascertain whether the amended returns reflect a further change in method of accounting for which respondent's consent is again
required. If it is, then because respondent has not consented *55 to the change, JHH may not revert to the LIFO method simply by filing amended returns. See, e.g.,
Drazen v. Commissioner, 34 T.C. 1070, 1075-1076 (1960).
A. Change to Specific Identification
In their posttrial briefs petitioners simply assume that, because respondent did not automatically consent to JHH's requested accounting method change, no change in fact occurred, and JHH was still on the LIFO method for its vehicles
"(...continued)
Sanders v. Andrews, 121 F. Supp. 584 (W.D. Okla. 1954); Boulez v.
Commissioner, 76 T.C. 209, 213-214 (1981) (concluding that an oral agreement entered into by an authorized agent was not binding on the IRS because applicable regulations required a written agreement), aff'd, 810 F.2d 209 (D.C. Cir. 1987).
- 26 -
[*26] inventory notwithstanding its filing oftax returns using another method.
Petitioners misconstrue section 446(e). That section provides that a taxpayer
"shall" secure consent "before computing his taxable income under * * * [a] new
method". Sec. 446(e). The statute's use ofthe word "shall" creates a legal duty to
seek advance consent to a change in accounting method; it does not foreclose as a
factual matter any unconsented change. Section 446 itself and our caselaw make
this point crystal clear.
Section 446(f) defines certain consequences of a taxpayer's failure to seek
consent to a change in method of accounting--to wit, the taxpayer may not cite the
absence of consent as a basis *56 for reducing or eliminating any determined penalty
or addition to tax. If it were factually impossible for a taxpayer to change its method of accounting without first securing consent, section 446(f) would serve no apparent purpose. "Under the surplusage canon we are to give effect to every
provision Congress has enacted." Rand v. Commissioner, 141 T.C. 376, 390
(2013) (citing United States v. Menasche, 348 U.S. 528, 538-539 (1955)). "[W]e
decline to read words out of the statute", see Tucker v. Commissioner, 135 T.C.
114, 154 (2010), aff'd, 676 F.3d 1129 (D.C. Cir. 2012), or in this instance, an
entire subsection.
- 27 -
[*27] Moreover, as we have expressly recognized, if a "taxpayer changes the
method of accounting used in computing taxable income without first requesting
the Commissioner's consent, then the Commissioner would appear to have at least
two choices." Sunoco, Inc. v. Commissioner, T.C. Memo. 2004-29, 87 T.C.M.
(CCH) 937-25, 945 (2004). "First, the Commissioner could assert section 446(e)
and require the taxpayer to abandon the new method of accounting and to report
taxable income using the old method ofaccounting. * * * Second, the
Commissioner could accept the change of accounting method and require the
taxpayer to make any adjustments which might be necessary to prevent amounts
from being duplicated or omitted". I£, 87 T.C.M. (CCH) at 945 (citations
omitted); accord Capital One Fin. Corp. v. Commissioner, 130 T.C. 147, 155
(2008), aff'd, 659 F.3d 316 (4th Cir. 2011). Indeed, section 446(e) affords the
Commissioner *57 "the power * * * to grant retroactive changes in accounting methods" as well as prospective ones. See Barber v. Commissioner, 64 T.C. 314,
319 (1975).
Respondent elected the latter course. For 2001 through 2007 JHH
accounted for its inventory on its income tax returns using the specific identification method. Respondent examined JHH's 2002 and 2003 returns and, in the notice of deficiency mailed January 6, 2012, determined that JHH had
- 28 -
[*28] "revoked its LIFO election * * * effective January 1, 2001". To the extent
that JHH changed its method of accounting, respondent has plainly accepted the change.¹³
We qualify the foregoing statement only because we have not yet
established that, by filing returns using the specific identification method, JHH did in fact change its method of accounting. Petitioners contend that their manner of accounting for inventory on JHH's original returns represented mere error, such that filing amended returns was necessary to correct that error. This argument
begs the question whether JHH ever changed its method of accounting.
¹³Historically, this Court and others have held that the Commissioner's consent to a change in method of accounting may be implied if the Commissioner has, over a sufficient *58 period ofyears, accepted without response or comment a taxpayer's income tax returns filed using a new method of accounting. See, e.g.,
Fowler Bros. & Cox v. Commissioner, 138 F.2d 774, 775-776 (6th Cir. 1943), a_ff'f'g 47 B.T.A. 103 (1942); S. Rossin & Sons, Inc. v. Commissioner, 113 F.2d
652, 654 (2d Cir. 1940), rev'g 40 B.T.A. 1274 (1939); Geometric Stamping Co. v. Commissioner, 26 T.C. 301, 304-305 (1956); Linen Thread Co., Ltd. v. Commissioner, 14 T.C. 725, 732-733 (1950). We have alluded to this "implied consent" doctrine without applying it in more recent cases. S_e_e Barber v.
Commissioner, 64 T.C. 314, 318 (1975); Perry v. Commissioner, T.C. Memo.
1990-228, 59 T.C.M. (CCH) 533, 536 (1990). We need not apply the doctrine in the instant case because respondent, in the notice of deficiency and throughout this litigation, has taken the position that JHH's application for automatic consent was effective--that is, that he did give consent. Sec. 446(e) empowers the
Commissioner to grant consent retroactively. See Barber v. Commissioner, 64
T.C. at 319. Thus, notwithstanding the failure ofJHH's 2001 application for automatic consent, respondent evidently approved the applied-for change at some point thereafter.
- 29 -
[*29] The Code does not define the phrase "method of accounting". The Court
has held that the phrase includes "the consistent treatment of any recurring
material item, whether that treatment be correct or incorrect." See Bank One
Corp. v. Commissioner, 120 T.C. 174, 282 (2003), aff'd in part, vacated in part on other grounds and remanded sub nom. J.P. Morgan *59 Chase & Co. v. Commissioner,
458 F.3d 564 (7th Cir. 2006); H.F. Campbell Co. v. Commissioner, 53 T.C. 439, 447 (1969), aff'd, 443 F.2d 965 (6th Cir. 1971). The regulations under section
446 define "method of accounting" as including "not only the over-all method of
accounting of the taxpayer but also the accounting treatment of any item." Sec.
1.446-1(a)(1), Income Tax Regs.
Those same regulations explain that a change in accounting method
includes: (1) "a change in the overall plan ofaccounting for gross income or
deductions" or (2) "a change in the treatment of any material item used in such overall plan." R para. (e)(2)(ii)(a). A material item, in turn, "is any item that
involves the proper time for the inclusion ofthe item in income or the taking of a
deduction." Id. That is, an item is a material item if a change in its treatment will
not change a taxpayer's lifetime income but will instead merely postpone or
accelerate the taxpayer's reporting ofincome. See, e.g., Wayne Bolt & Nut Co. v.
Commissioner, 93 T.C. 500, 510 (1989). With respect to inventories specifically,
- 30 -
[*30] "[a] change in an overall plan or system of identifying or valuing items in inventory" or "a change in the treatment of any material item used in the overall
plan for identifying or valuing items in inventory" constitutes a change in
accounting method. Sec. 1.446-1(e)(2)(ii)(c), Income Tax Regs.
Conversely, *60 "[a] change in method of accounting does not include
correction of mathematical or posting errors, or errors in the computation of tax
liability". I_d. subdiv. (ii)(b_). A "mathematical" error is "an error in addition,
subtraction, multiplication, or division". Sec. 6213(g)(2)(A); Capital One Fin.
Corp. v. Commissioner, 130 T.C. at 166; Huffman v. Commissioner, 126 T.C. 322,
343-344 (2006), aff'd, 518 F.3d 357 (6th Cir. 2008). "A posting error is an error
in 'the act oftransferring an original entry to a ledger.'" Wayne Bolt & Nut Co. v.
Commissioner, 93 T.C. at 510-511 (quoting Black's Law Dictionary 1050 (5th ed.
1979)). Where error correction "results in a change of accounting method", however, the consent requirement of section 446(e) applies. S_e_e Huffman v. Commissioner, 126 T.C. at 354.
The line between a change in accounting method and mere error (or its correction) is a fine one. In Huffman, we exhaustively reviewed our caselaw and that of other courts dealing with what constitutes an accounting method change. See id. at 345-354. Recognizing inconsistencies in our prior caselaw, we
- 31 -
[*31] emphasized that "it is the consistent treatment of an item involving a question of timing that establishes such treatment as a method of accounting." Id. at 354. For that reason, "a short-lived deviation from an already established
method of accounting need not be viewed as a establishing a new method of
accounting." Id. *61 And in that case, "neither the deviation from, nor the subsequent adherence to, the method of accounting would be a change in method of accounting." Q
As we observed in Huffman: "The question, ofcourse, is what is short-
lived." Id. The Court has answered this question in various ways. We have suggested that a two-year deviation can establish a new method of accounting.
See Johnson v. Commissioner, 108 T.C. 448, 494 (1997) ("Ifthe change [in
reporting method] affects the amount of taxable income for 2 or more taxable years without altering the taxpayer's lifetime taxable income, then it is strictly a matter of timing and constitutes a change in method of accounting."), aff'd in part, rev'd in part on other grounds, 184 F.3d 786 (8th Cir. 1999); see also Capital One Fin. Corp. v. Commissioner, 659 F.3d at 326 ("Treatment of a material item consistently in two or more consecutively filed tax returns constitutes a method of accounting for which consent is required to change--even if that treatment is erroneous or an incorrect application of a chosen method."). We have also firmly
- 32 -
[*32] held that a 10-year deviation, consistently followed, reflects a change in
method of accounting. Huffman v. Commissioner, 126 T.C. at 354.
As we said in Huffman: "We need not today determine how long is short." Id. JHH deviated from its previously established LIFO method on *62 seven consecutively filed tax returns, from 2001 through 2007, before seeking to amend
its returns. JHH consistently used the specific identification method for its
vehicles inventory for a seven-year period. Because use ofthe specific
identification method rather than the LIFO method accelerated JHH's recognition
of vehicle sales income, s_ee sgra note 4, it involved a question of timing.
Regardless ofthe upper temporal boundary of a "short-lived deviation", we think
that seven years lies beyond it. JHH's "consistent treatment of an item involving a
question oftiming * * * establishes such treatment as a method of accounting."
See Huffman v. Commissioner, 126 T.C. at 354. Notwithstanding its failure to secure respondent's automatic consent, JHH changed its method of accounting from LIFO by accounting for its vehicles inventory on the specific identification method on its 2001 through 2007 tax returns.
B. Reversion to LIFO
Petitioners hang their hats on the argument that they did not receive respondent's consent to terminate LIFO in 2001 and the assumption that, in the
- 33 -
[*33] absence of such consent, a change in accounting method simply cannot occur. From these premises, they reason that JHH's attempt to restore the LIFO
method *63 reflects simply the correction of error for which no consent is needed. They do not confront whether, if JHH did change its method of accounting in 2001, albeit without the required consent, JHH's amended returns reflect a second change in method of accounting. Respondent contends that at least some ofthe
changes on JHH's amended returns are changes in the treatment of material items and thus changes in method of accounting for which respondent's consent was required but not granted."
"In their briefs the parties debate whether changing from an erroneous method of accounting to a proper one requires the Commissioner's consent. As framed, their dispute would appear to be resolved by sec. 446(e), which by its terms applies to all changes in method of accounting, and by sec. 1.446-1(e)(2)(i),
Income Tax Regs., which expressly brings a change from an improper or unpermitted method of accounting within the ambit of sec. 446(e). The more relevant question is whether a taxpayer's change in reporting constitutes a "change in method of accounting" within the scope ofthe statute.
Pointing to a footnote in S. Pac. Transp. Co. v. Commissioner, 75 T.C. 497,
682 n.208 (1980), supplemented by 82 T.C. 122 (1984), petitioners insist that governing caselaw holds that changing from an erroneous method to a proper *64 method does not require consent. As petitioners expressly recognize, however, the actual issue in that case was not whether the taxpayer could change its accounting method without the Commissioner's consent, but rather whether the proposed change in reporting was in fact a change in accounting method, so the footnote on which petitioners rely is merely dictum. Moreover, the tax years at issue in that case were 1959-1961, see id. at 505, so this Court had no need to consider the
effect ofT.D. 7073, 1970-2 C.B. 98, which brought change from an improper or (continued...)
- 34 -
[*34] As we have concluded above, although JHH did not receive automatic
consent, it nevertheless changed from the LIFO method of accounting to the
specific identification method for its vehicles inventory in 2001. JHH's attempt to
revert to the LIFO method with its amended returns constitutes a second attempted
change in method of accounting under our caselaw and both alternative definitions
in the regulations.
We have held "that a taxpayer does change its method of accounting when it
changes its treatment of an item in order to adhere to a method adopted pursuant to
a prior accounting election." S_ee Capital One Fin. Corp. v. Commissioner, 130 T.C. at 169 (citing Sunoco, Inc. v. Commissioner, T.C. Memo. 2004-29, and First Nat'l Bank of Gainesville v. Commissioner, 88 T.C. 1069 (1987)); see also
Huffman v. Commissioner, 126 T.C. at 352-354 (analyzing whether and under *65 what circumstances "a taxpayer does not change its method of accounting when it
merely conforms to a prescribed (but ignored) method of accounting", recognizing
inconsistencies in prior caselaw, and concluding that by ignoring the prescribed method, the taxpayer had established a new method of accounting). On its amended returns JHH changed its treatment of its vehicles inventory to adhere to
"(...continued)
unpermitted method expressly within the scope of sec. 1.446-1(e)(2)(i), Income Tax Regs.
- 35 -
[*35] its previously elected LIFO method, and this change constituted a change in
method of accounting.
Second, a change from specific identification to LIFO is a change in an overall plan or system of identifying items in inventory and thus qualifies as a
change in method of accounting. S_ee sec. 1.446-1(e)(2)(ii)(c), Income Tax Regs
(providing that "[a] change in an overall plan or system ofidentifying or valuing items in inventory" constitutes a change in method of accounting for purposes of section 446(e)).
Third, the two changes that JHH proposed to make with its amended returns
involve material items. The first change reversed the section 481(a) recapture of
LIFO reserve that JHH had earlier included on its 2001, 2002, and 2003 income
tax returns. The second change computed LIFO reserve amounts for *66 tax years
2001, 2002, and 2003 and deducted them. Section 481(a) adjustments constrain
the extent of income deferral attained through use ofthe LIFO method. When a
taxpayer terminates LIFO, section 481(a) mandates inclusion in income of the
LIFO reserve. Absent LIFO termination, inclusion of the LIFO reserve would
occur only upon liquidation or reduction of inventory. JHH's reversal ofthe
section 481(a) adjustment and deduction of additional LIFO reserve amounts
retroactively postponed its recognition ofLIFO reserve. Hence, both changes
- 36 -
[*36] relate to the proper timing of income and so amount to changes in the
treatment of material items. S_ee sec. 1.446-1(e)(2)(ii)(a), (c), Income Tax Regs. Accordingly, under our caselaw and under either prong ofthe definition in
section 1.446-1(e)(2)(ii)(a), Income Tax Regs., the changes that JHH made on its
amended returns constitute a retroactive change in method of accounting for which respondent's consent was required. Respondent was well within his discretion to
refuse such consent and to refuse to accept JHH's amended returns. he
Badaracco v. Commissioner, 464 U.S. 386, 393 (1984) (observing that "the
Internal Revenue Code does not explicitly provide either for a taxpayer's filing, or
for the Commissioner's acceptance, of an amended return" and that consequently
"an amended return is a creature of administrative origin and grace"); Capitol *67 Fed.
Sav. & Loan Ass'n v. Commissioner, 96 T.C. 204, 211 (1988) (describing whether
to permit a taxpayer to change its method of accounting as "a matter within the
discretion ofthe Commissioner").
III. Conclusion
JHH did not receive automatic consent under Rev. Proc. 99-49, supra, to
change its method of accounting for its LIFO inventory to specific identification. Notwithstanding its failure to obtain the consent required by section 446(e), by consistently accounting for that inventory on its 2001 through 2007 income tax
- 37 -
[*37] returns using the specific identification method, JHH changed its method of
accounting. JHH's proffered amended returns, on which it attempted to revert to
the LIFO method, reflect a second change in method of accounting to which respondent may refuse consent under section 446(e). JHH did not obtain that consent. Accordingly, respondent was entitled to reject JHH's amended returns, and petitioners are not entitled to their claimed refunds.
To reflect the foregoing,
Decision will be entered under
Rule 155.